W. R. GRACE & CO. v. LUCKENBACH S. S. CO., Inc., et al.

(District Court, E. D. Virginia. May 24, 1919.)

1. DAMAGES ☞62(4)—CONTRACT FOR TONNAGE—ACCRUAL OF RIGHT OF ACTION —EXTENSION OF TIME.

It was not incumbent upon the contractor with a steamship company for tonnage, immediately on failure of the company to furnish the tonnage, to obtain other tonnage to carry out the contract, the time provisions of the contract being extended by agreement, as there was no actionable breach until a letter from the company to the contractor, in which the latter was advised absolutely the contract would not be carried out, when the rights of the parties were fixed, and a right of action accrued to the contractor to establish and sue for its damages.

2. DAMAGES ☞62(4)—BREACH OF CONTRACT TO FURNISH TONNAGE—DUTY TO MINIMIZE.

Damages from breach of contract to furnish shipping tonnage should be computed on the basis of such compensation to the injured party as is necessary to place it in the situation it would have occupied in the absence of breach; but the law imposes on a party subjected to injury from such a breach of contract a duty to make reasonable exertions to render the injury as light as possible.

3. CONTRACTS ☞172—DUTY TO FURNISH TONNAGE—AMOUNT.

Where a shipping company contracted to furnish 75,000 tons of carriage, 10 per cent. more or less, though before breach it could have fulfilled its obligation by delivering freight room for 67,500 tons, after breach it was under obligation to furnish the 69,200 tons, evidenced by the list of vessels it had previously furnished to the contractor for tonnage, less the number of tons actually furnished.

4. SHIPPING ☞58(3)—BREACH OF CONTRACT—CHARGE FOR CUSTOMARY GRATUITIES.

Where a shipping company contracted to furnish tonnage, and breached its contract, so that the contractor for tonnage was obliged to secure other ships, the steamship company is not chargeable, as an item of the expense of such other ships, with bonuses or gratuities customarily extended to the captain and officers of ships for faithful services.

5. SHIPPING ☞58(3)—BREACH OF SHIPPING CONTRACT—IMPROPER CHARGE AGAINST PARTY IN FAULT.

Where a shipping company which had contracted to furnish tonnage breached its contract, so that the contractor for tonnage was obliged to procure other ships, the shipping company was not chargeable, at the suit of the contractor, with 2½ per cent. "commissions on disbursements" covering the entire cost of operation of the other vessels procured by the contractor for tonnage; a commission being admittedly charged only as a matter of bookkeeping, and being in effect a charge for an entire service, part of which devolved on the injured party as a condition precedent to sustaining its claim for damages.

6. SHIPPING ☞58(3)—BREACH OF SHIPPING CONTRACT—CHARGE AGAINST PARTY IN FAULT.

In an action by a contractor for tonnage against the shipping company, which had breached its contract, where in the contract the contractor for tonnage was allowed a commission of 2½ per cent., not really for services, but rather as rebate, and where such commission has been allowed to the contractor for tonnage in fixing the net amount which the shipping company was entitled to charge as an offset against the contractor, such amount will be disallowed as a charge in the case of vessels chartered by the contractor after the shipping company's breach.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. SHIPPING ☞58(3)—BREACH OF CONTRACT—CHARGE AGAINST PARTY IN FAULT—EXPENSE OF MINIMIZING DAMAGES.

Where a shipping company breached its contract to furnish tonnage, the contractor for tonnage, in its action for damages, is entitled to allowance for the services of a department of its business rendered in securing other vessels, in reducing as far as possible the cost of carrying the goods involved, though it is difficult to determine precisely what the amount should be.

8. DAMAGES ☞68—BREACH OF CONTRACT—INTEREST ON UNLIQUIDATED CLAIM.

Where a shipping company contracted to furnish tonnage, and on account of general war and consequent scarcity of shipping the contract proved to be unprofitable and ill-advised, so that the shipping company breached it and refused to furnish the tonnage, the contractor for tonnage was entitled to recover interest on the amount of its damages from the time when the damages became ascertained by the contractor for tonnage having procured other vessels, though as a general rule interest may not be allowed on unliquidated damages for breach of contract; application of the rule resting in discretion.

In Admiralty. Libel by W. R. Grace & Co. against the Luckenbach Steamship Company, Incorporated, and the Luckenbach Company, Incorporated. On exceptions to the commissioner's report. Decree overruling the exceptions and affirming the report directed to be entered.

This case was heretofore heard and decided by this court on the 12th day of March, 1918, and will be found reported in 248 Fed. 953, to which reference is made, without restating the facts, and the cause is now before the court upon the exceptions of the libelant and respondents to the report of Commissioner D. Lawrence Groner, to whom the same was referred by order of the 25th of April, 1918, filed herein on the 25th of November, 1918. The report is as follows:

### Preliminary Statement.

The libelant, Grace & Co., a Connecticut corporation, a part of whose business is the importation of nitrates from South America to the United States and their sale to customers here, entered into a written contract with the Luckenbach Steamship Company, Incorporated, on or about the 25th day of October, 1916, as the result of which it was agreed between the parties to the contract that the steamship company would provide for Grace & Co. freight room for 75,000 tons, 10 per cent. more or less, at the option of the steamship company, of nitrate and/or ores, between the 1st of December, 1916, and the 31st of July, 1917, such cargoes to be loaded at one or two ports between Valparaiso and Pasagua, in Chili, and transported thence to one port between Savannah, Ga., and Boston, Mass., in the United States. The freight rate provided in the contract was $15.50 per ton of 2,240 pounds delivered, less 2½ per cent. "address commission," or, in other words, a net rate or charge of $15.11¼ per ton.

The contract was complied with by the steamship company only to the extent of one shipment, aggregating 5,998 tons, which was delivered at the port of New York between the 22d of April, 1917, and the 9th of May, 1917. However, on the 23d of April, 1917, Edgar F. Luckenbach, president of the steamship company, wrote and forwarded to Grace & Co. a letter, in answer to one from it inquiring as to the dates when other ships might be expected to be furnished, in which he said: "In answering the same, beg to inform you that we cannot carry out this freight room contract, which was supplemented by the usual form of nitrate charter party adopted and used by your company, and which usual form of nitrate charter party was made a part of the freight room contract, for the reason that a state of war exists between this gov-

ernment and the government of Germany, and we are released under article 13 of this nitrate charter party reading: "The * * * enemies, pirates, * * * arrest and restraint of princes, rulers and people, political disturbances and impediments, * * * always mutually excepted.'"

The refusal by the steamship company thus announced to carry out the contract was the basis of this proceeding. Grace & Co., having thereafter made other arrangements resulting in bringing forward the nitrate, filed a libel in personam in this court against both the Luckenbach Steamship Company, Incorporated, and the Luckenbach Company, Incorporated; the joinder of the latter company as a defendant being because, as was alleged, the two companies were identical, having the same ownership, directors, and officers, and the steamship company, the immediate party to the contract, being a mere agency of the Luckenbach Company for greater convenience in financing and carrying out the contracts of the latter company. The defense set up by the defendant was that, because of a state of war existing between the United States and Germany and the danger of capture of the vessels proposed to be used, it was released and discharged from the performance of the contract. Your honor held the clause of the contract so invoked inoperative under the circumstances, and also held that the two companies were substantially the same, and were in their joint capacities carrying on the business out of which the breach of contract arose, and were jointly and severally chargeable with the carrying out of the same; and, the defendants declining to make any other or further defense, the case was by proper decree referred to me to ascertain the amount of damages suffered by the libelant.

## Part I.

It will be seen by reference to the foregoing statement that the contract which is the subject of this suit was made October 25, 1916, and by the terms thereof was to be performed between the 1st of December, 1916, and the 31st of July, 1917, a period embracing eight calendar months. It was contemplated between the parties that the movement would average approximately 9,000 tons per month, but this understanding was subject to a further provision "that all quantities and deliveries to be mutually arranged between the party of the first part and the party of the second part to suit the steamers of the party of the first part." As early as November, 1916, Grace & Co. begun asking for definite information from the steamship company as to what arrangements were being made for carrying out the contract, and correspondence on this subject between the parties was introduced in evidence and is returned herewith, marked "Libelant's Exhibits 11 to 43, inclusive." This correspondence runs through the months beginning with November, 1916, and ending the latter part of April, 1917. Throughout it shows, on the one hand, Grace & Co. urging the carrying out of the contract and seeking information as to the probable arrival dates at the loading ports of the promised vessels, and, on the other hand, the steamship company giving information and assurances of the movements of their vessels and repeated promises of their early dispatch to the nitrate ports for loading. Throughout the period mentioned there is not a single suggestion on the part of the Luckenbach Company of a repudiation of the contract. On the contrary, there is a recognition of its binding character and reiterated statements apparently showing a determination to furnish the vessels and lift the nitrate. While, therefore, it is undoubtedly true that the provision of the contract as to the time of the delivery of a part of the nitrate was then in default, and while it is perhaps equally true that this failure might, at the option of Grace & Co., have then and there been made the basis of a suit for damages, it is also true that by agreement of parties this provision of the contract was not insisted upon, and it follows that, if thereafter the steamship company had furnished the required tonnage in the amounts contracted for, no breach would have occurred. In other words, the agreement for vessel space for 9,000 tons per month, beginning with December, was not insisted upon by Grace & Co. as the result of the direct promise of the steamship company that it would thereafter furnish the vessels.

[1] It follows, therefore, that there is no merit in the position of the steamship company that it was incumbent upon Grace & Co., immediately upon the failure of the steamship company in December and January, and so on, to furnish the tonnage contracted for, then and there to obtain other tonnage to carry out the contract. The attitude of the parties conclusively shows that they did not so interpret the agreement, and to hold now that the one for whose benefit it was made, and who, to accommodate the other, did not insist that it be fulfilled, had thereby waived its right thereafter to claim a full compliance with the obligation to furnish the tonnage contracted for, would be unconscionable, and would permit the other party, by whose promises of the tonnage on fixed dates the waiver was induced, to take advantage of its own default. It therefore follows that the time provisions of the contract were, as stated, extended by agreement of parties, and that there was, under the circumstances, no actionable breach thereof until the letter of April 23, 1917, from the steamship company to Grace & Co., in which the latter was advised by the former that the contract would not be carried out. In my opinion, the rights of the parties were fixed as of this date, and a right of action then and there accrued to Grace & Co. to establish and thereafter to sue for the damages which it had thereby sustained. That the contract was lawfully made between the parties is admitted. That it was breached by the steamship company has been decided by your honor in the opinion upon the previous hearing.

[2] It follows, therefore, that the damages to be allowed should be computed on the basis of such compensation to the injured party as shall be necessary to place it in the situation that it would have occupied if no breach had occurred. Such damages as will restore to it all that it has lost in the instant case would include such expenditures as were necessary in the exercise of ordinary prudence on his part in the carrying out of the terms of the contract. While this is true, it is equally true that the law imposes upon a party subjected to injury from a breach of contract such as is here shown the duty of making reasonable exertions to render the injury as light as possible. These two general principles are fully recognized by all the authorities, and excellently stated in the opinion of the Circuit Court of Appeals, Sixth Circuit, speaking through Judge Taft, in The Oregon, 55 Fed. 666 et seq., 5 C. C. A. 229, from which it may not be amiss to quote the following: "Damages for breach of contract should be such compensation as will restore the injured party to the same pecuniary condition that he would have been in, had the contract been performed. * * * If, therefore, in cases of freight contracts, the carrier refuses to perform, it is the duty of the shipper, if he can reasonably expect thereby to reduce his loss, to seek other means of transportation, and perform the contract himself. In such a case the difference between his actual pecuniary condition and that in which he would have been had the carrier transported the goods under the contract is, not the profit which he would have made had the contract been performed—for the contract has been performed, and he has acquired the opportunity to sell his merchandise at the market value prevailing at the place of destination—but it is the increased expense of performing the contract; that is, the difference between the contract rate of freight and the freight which he was actually obliged to pay to secure performance. * * * Of course, there is a limit to the increased expense which the injured party may incur in doing what the other was obliged, under the contract, to do, and which he may charge to that other. The limit is suggested in the rule laid down in the leading case of Hadley v. Baxendale, 9 Exch. 341, under which damages for a breach are limited to such as would naturally flow from the breach within the reasonable contemplation of the parties at the time of making the contract. He cannot go to extraordinary and unreasonably excessive expense or take unusual means to accomplish that which the other party agreed to do, and thus impose on the other liability for damages out of all proportion to what either party might have reasonably expected as the loss from the breach. In Le Blanche v. Railway Co., 1 C. P. Div. 286, 302, Lord Esher, Master of the Rolls, then Mr. Justice Brett, used this language: 'We think it may properly be said that, if the party to perform a contract does not perform

it, the other may do so for him, as reasonably near as may be, and charge him for the reasonable expense in so doing.' "

[3] In order to apply these general principles to the facts as shown by the evidence at hand, the first question which arises is the amount of tonnage as to which default was made. The contract, as has been repeatedly shown, provided specifically that the steamship company should furnish to Grace & Co. freight room for 75,000 tons; but it is insisted by the steamship com pany that, since this clause of the contract contained an option to it to reduce this amount 10 per cent., it was in fact liable only for the carriage of 67,500 tons, less the amount actually carried. In other words, it now insists that after its breach of contract it has the right to exercise the option, and that, instead of 75,000 tons of nitrate, it may and does elect to be bound only to the lesser extent. There is, I think, no question that, if the contract had not been violated, the steamship company could have claimed fulfillment of its obligation when and after it had delivered freight room for 67,500 tons, but another and different question arises under the circumstances here. During the period of its recognition of the contract, confessedly it made no specific election. If there were nothing more in the case, I should unhesitatingly conclude that the status of the contract was at the time of its breach identical as at the time it was made, for I take it that the rule is very clear that, when one contracts in the alternative to do one of two things within a given time, he has until the time is past the right to elect which of them he will perform, but, if he suffers the time to elapse without performing either, his contract is broken and his right to elect is lost. Choice v. Moseley, 1 Bailey (S. C.) 136, 19 Am. Dec. 661.

But it appears from the evidence in this case that some time in March or April, 1917, and while the performance of the contract was still in contemplation by both parties, the steamship company through its president delivered to Grace & Co. a memorandum (or data from which it was made) containing the names of the steamers which it purposed to furnish to carry out the contract, and with the capacity and probable sailing date of each. The list so furnished included the steamers J. L. Luckenbach, 6,000 tons, April loading; Florence Luckenbach, 8,200 tons, May loading; Lewis Luckenbach, 6,000 tons, May-June loading; Hattie Luckenbach, 6,000 tons, June-July loading; Edgar Luckenbach, 12,000 tons, July-August loading; Julie Luckenbach, 12,000 tons, August-September loading; D. N. Luckenbach, 4,000 tons, May-June loading; Henry Luckenbach, 4,000 tons, May-June loading; J. L. Luckenbach, 6,000 tons, June loading; Pleiades Luckenbach, 5,000 tons, July-August loading—the aggregate tonnage proposed to be transported on these ten vessels being 69,200 tons. The program thus outlined by the steamship company contemplated the execution of the contract in its entirety. It was in effect a statement on its part that it would furnish shipping for 69,-200 tons, and it was accepted by Grace & Co. if and when fulfilled as a compliance with the contract. It is true that there appears to have been no precise statement at the time that the cargo tonnage named was to be considered by the parties as completing the contract; but I think the only fair inference is that there was a meeting of minds at the time in question, and an agreement then and there that the steamship company was to be bound only to the extent mentioned, and that a compliance by it with the terms of the memorandum would entitle it to a full discharge under its contract. This being true, I have chosen to treat the contract as one on the part of the steamship company to furnish freight room for 69,200 tons, and as admittedly they did in fact furnish freight room for 5,998 tons, the amount of damages for which they are answerable is for failure to furnish freight room for 63,202 tons.

### Part II.

This being the basis upon which the damages are to be ascertained and determined, it follows that the next inquiry is whether the conduct of Grace & Co. after the breach of the contract, and in carrying out its provisions, was only such as to restore the situation as nearly as possible to that which it would have been if no breach had occurred. The contract between the steamship company and Grace & Co. for the transportation of the nitrate was on what is known in the shipping business as a rate basis, as distinguished from

a time basis; the difference between the two being that in the case of the rate charter the cost is definitely fixed and ascertained, whereas in the case of the time charter there is a considerable element of doubt, growing out of possible delays in the voyage, opportunities of obtaining cargoes from the port of delivery to the cargo port, etc. When the contract for the shipment of 75,000 tons of nitrate in question was made, the market rates for shipping from South to North America were comparatively easy, and charters on either basis easily obtained. The United States had not then entered the war, and, if the breach had then occurred, it would have been a fairly easy matter for Grace & Co. to have reinstated themselves and lifted the shipment in question with but little additional expense; but between the time of making the contract and the breach a declaration of war had been made between this country and Germany, and the demand for shipping became almost at once abnormally great, resulting in a stiffening and constantly ascending scale of rates.

In the latter part of 1916 the rate for tonnage from South to North America ranged around $15. In April and May, 1917, it had advanced by increased demand to a point where it was then practically impossible to make rate charters at all. Grace & Co., who are among the largest importers of nitrates, their importations in the year 1917 amounting to approximately 600,000 tons, and who were therefore as well equipped as it is possible to be to secure tonnage, went into the market, making bids in an effort to obtain rate charters to lift the nitrate included in the Luckenbach contract. Its vice president, Mr. Fisher, testified that to this end he made several offers for vessels on rate charters, but in each instance was outbid by competitors, and succeeded in getting only one vessel, the Plymouth, at $33.50 a ton. Finding it quite impossible to make any progress in this direction, and that the effects of continuing the competitive bidding would be to still further increase the rate, he did what in my opinion was prudent in the circumstances, and proceeded to get vessels on time charters at the lowest rates then offering in the market. In this way he succeeded in getting possession of the following vessels: S. S. Jelling, chartered May 4, 1917; S. S. Camaguey, chartered May 4, 1917; S. S. Ruby, chartered May 15, 1917; S. S. Thorgerd, chartered May 21, 1917; S. S. Laura Maersk, chartered May 31, 1917; S. S. Edw. Pierce, chartered May 28, 1917; S. S. Karen, chartered June 13, 1917; S. S. Santiago, chartered June 13, 1917; S. S. Evelyn, chartered June 18, 1917; S. S. Edith, chartered June 20, 1917; S. S. Montosa, chartered June 21, 1917; S. S. Clare, chartered June 23, 1917; S. S. Otterstad, chartered June 28, 1917; S. S. Alderney, chartered May 8, 1917; S. S. Plymouth, chartered June 22, 1917.

The latter was the only one of the lot chartered on a rate basis, the other 14 vessels being chartered originally for such periods of time required for the completion of the journey from North to South America, the loading, and back again, and while as to a number of them the period of time required in obtaining cargoes was considerably lengthened by unexpected labor conditions more fully referred to hereafter, the uncontradicted evidence shows that their operation from start to finish and in all its details was conducted by men of experience and admitted capacity and with due regard to minimizing the cost. The total amount of tonnage carried by the fifteen vessels named was 67,763 tons, which is 4,561 tons in excess of the amount which, in my view of the law, is chargeable against the steamship company. In the computation of damages which I shall hereafter make, I have therefore charged off this excess of importation, on the same basis, to Grace & Co. In Libelant's Exhibit No. 7, returned with this report, there is a detailed statement of the cost of operation of the 14 vessels used to lift the nitrate.

[4] I have carefully examined and verified the correctness of the figures there detailed, and the uncontradicted evidence I think amply supports the statement that the expenses of the voyage were reasonable and the charges made, except as hereinafter mentioned, entirely fair; the exception being the charge in each instance of an item under the head of "gratuities." These items, I think, should be disallowed. While the evidence shows that it is the custom of the charterer of a vessel to give a small bonus to the captain and other officers of the ship, under the head of gratuity, for faithful services, I think such a custom is allowable only where the gratuity given is chargeable

against the person giving the same. In this case the ships in question were being operated at the cost of the defaulting signatory to the contract, to wit, the steamship company, and, however universal the custom, it seems to me indefensible to charge against it, notwithstanding its default, an item of expense only justified by custom and optional with the giver.

[5] I am also of opinion that a charge of 2½ per cent. "commissions on disbursements," covering the entire cost of operation of the 14 vessels, is not allowable under the circumstances. This commission in this instance admittedly was charged only as a matter of bookkeeping, and, while it is usually allowed under more or less like conditions, in this instance it would be in effect a charge for an entire service, part of which, in my view of the law, devolved upon the injured party to the contract as a condition precedent to sustaining the claim for damages.

[6] I am further constrained to take this position for the reason that in the contract between the steamship company and Grace & Co. the latter were allowed a commission of 2½ per cent. The services which they were to render for this commission are not stated, and are presumably negligible, if any at all, the commission being more accurately described as a rebate than a commission; but since I have allowed it, as I am bound to do under the terms of the contract, in fixing the net amount which Luckenbach was entitled to charge as an offset against Grace, I think it fair and proper to disallow it as a charge in the case of the vessels chartered after the breach of the contract.

[7] It does not follow from this, however, that there should not be some allowance made to Grace & Co. for the services of another department of their business than that directly concerned in the making of the contract with Luckenbach, being services rendered by them in securing the vessels and in reducing as far as possible the cost of lifting the nitrate. That these services were valuable is shown by the fact that they secured in the case of each vessel, save 4, downward freight—that is to say, cargo from North to South America—at figures which in the aggregate largely reduced the cost of the vessels in question, and to that extent reduced the per ton cost of lifting the nitrate, and while it is difficult to determine precisely what this amount should be, I think it is fair and reasonable under the circumstances to fix it at $10,000, equal to about 2½ per cent. of downward freight, which is accordingly done. With these deductions and this allowance, I think the account as stated in Exhibit No. 7 is correct, and reflects the true and accurate cost per ton of lifting the nitrate, for which default was made by the steamship company.

At the request of counsel for the respondent, the commissioner required the libelant to furnish a schedule (see Libelant's Exhibit 44) of all vessels chartered and used by it between May, 1917, and July, 1917, with a view of determining from such exhibit whether the particular vessels chartered for the purpose and charged against the steamship company were secured at an exorbitant or inflated rate, as against that obtaining for the carriage of other nitrate. While the difference in the cost per ton is a little more than $2 for the vessels engaged exclusively in lifting the nitrate in default, there is positive and uncontradicted evidence in the record that the 14 vessels mentioned and secured on time charter and the 1 on rate charter, as shown in Exhibit 7, were chartered for the express purpose of carrying out the Luckenbach contract. There being an absence of any evidence to show that due care was not used in the making of these charters, and there being, on the contrary, an abundance of evidence to show that due care was used, I am of opinion, and so report, that the cost per ton of carrying other nitrate for Grace & Co. over the period mentioned ought not to affect or change the amount of the recovery herein. It is true, as already mentioned, that the cost per ton was increased by reason of conditions prevailing in Chili when the vessels arrived there for their cargoes. These conditions, growing out of local labor disputes, as a result of which no work was done for several weeks, is a matter of which, in my opinion, the steamship company may not complain. If it had performed its contract according to its terms, much, if not all, of the nitrate which it had undertaken to lift would have been brought to this country prior to the date of these labor troubles. It first de-

layed and then broke its contract, and the result of this combination was not only to increase the price which it was necessary to pay to put the injured party in statu quo, but also to increase the expense of the operation by reason of the conditions mentioned.

Proceeding, therefore, to determine the amount of damages allowable, it will be seen, by reference to the schedule contained in Exhibit 7 and the evidence offered in support of same, that the average cost to Grace & Co. per ton for transporting the nitrate which the steamship company was obligated under its contract to transport was $36.81, making the total cost to Grace & Co. of transporting 63,202 tons, the amount in default $2,326,465.62. From this amount, however, should be deducted, as already noted, the following charges as commissions:

| | | |
|---|---:|---:|
| Amount forward ............................................... | | $2,326,465.62 |
| S. S. Jelling .......................... | $3,803 00 | |
| S. S. Camaguey ....................... | 4,462 08 | |
| S. S. Ruby ........................... | 4,666 63 | |
| S. S. Thorgerd ........................ | 4,422 55 | |
| S. S. Laura Mearsk .................. | 3,536 82 | |
| S. S. Edw. Pierce .................... | 4,694 52 | |
| S. S. Karen .......................... | 2,249 49 | |
| S. S. Santiago ....................... | 5,620 32 | |
| S. S. Evelyn ......................... | 4,752 76 | |
| S. S. Edith .......................... | 5,404 55 | |
| S. S. Montosa ........................ | 5,099 03 | |
| S. S. Clare .......................... | 5,568 10 | |
| S. S. Otterstad ...................... | 5,965 23 | |
| S. S. Alderney ....................... | 4,456 56 | |
| Making a deduction of......................... | $64,701 64 | |

There should be, as hitherto stated, a further deduction as follows

Gratuities on account of crew:

| | | |
|---|---:|---:|
| S. S. Jelling .......................... | $438 00 | |
| S. S. Camaguey ....................... | 380 00 | |
| S. S. Ruby ........................... | 464 60 | |
| S. S. Thorgerd ........................ | 100 00 | |
| S. S. Laura Mearsk .................. | 351 00 | |
| S. S. Edw. Pierce .................... | 371 00 | |
| S. S. Karen .......................... | 330 00 | |
| S. S. Santiago ....................... | 400 00 | |
| S. S. Evelyn ......................... | 370 00 | |
| S. S. Edith .......................... | 425 00 | |
| S. S. Montosa ........................ | 462 50 | |
| S. S. Clare .......................... | 462 50 | |
| S. S. Otterstad ...................... | 610 00 | |
| S. S. Alderney ....................... | 400 00 | |
| Making a further deduction of.................... | 5,564 60 | |
| Or a total for all purposes of ................... | | 70,266 24 |

| | |
|---|---:|
| Which deducted from the gross cost of completing the contract would leave ................. | 2,256,199 38 |
| To which should be added the arbitrary allowance mentioned above for services in securing downward cargoes, etc., ......................... | 10,000 00 |
| | $2,266,199 38 |
| Against which should be deducted the amount payable to Luckenbach under the contract, which, on the basis of 63,202 tons, the amount which it was liable to carry at $15.11¼ per ton net, was.. | 955,140 22 |
| Making the total amount of damages recoverable | $1,311,059 16 |

### Part III.

Having now ascertained and fixed the amount of damages recoverable, there remains only to be determined the question of whether interest should be allowed on this amount.

[8] As a general rule, interest may not be allowed on damages for breach of contract, where such damages are unliquidated and cannot be ascertained by computation, or are so uncertain in amount that they can only be established by litigation. The application of the rule however, is a matter of discretion, depending upon the circumstances in the particular case. Dyer v. Nav. Co., 118 U. S. 507, 6 Sup. Ct. 1174, 30 L. Ed. 153. In the case at bar the damages at the time of the breach were unascertained and unliquidated. After the breach occurred Grace & Co. proceeded at once to do the thing which the steamship company had wrongfully refused to do. The thing done consisted in the transportation of the nitrate from Chili to the United States. This, as has been shown, Grace & Co. did by means of the charter of various vessels hereinbefore enumerated, the last of which arrived at the port of discharge October 13, 1917. When this occurred the damages were ascertained and then and there were payable. If the refusal to pay were based upon excessive demands or unwarranted charges, it would be the proper exercise of discretion to refuse to award interest; but the facts show that this is not true here. The conduct of the libelant was scrupulously fair; that of the respondent, not such as to appeal to the conscience of the chancellor. The facts conclusively show that it made a contract at a time when there was only a fair demand for its vessels, and at a price which presumably would have yielded a fair profit. Relying upon its undertaking, Grace & Co. contracted with its customers for the sale of the amount of nitrate, based on freight cost under the contract, and thereby became liable to such purchasers for the delivery of the same. Having made the contract, the steamship company delayed its fulfillment upon various grounds from time to time until a state of war between this country and Germany having been declared, it thought it saw an opportunity of avoiding a contract which the supervening circumstances show to have been unwisely made, and deliberately breached the same, and, in disregard of the ground upon which the breach was justified, immediately chartered a part at least of the same fleet which it had promised to use in the Grace contract to competitors of the latter company in precisely the same service, at prices far and away above those named in the original contract.

The answers to the interrogatories filed as a part of the record in the case fully sustain the foregoing conclusions, and, except for the fact that the respondent declined to offer any evidence, it is not too much to say that the record doubtless would have shown that even the large amount of damages here allowed were but little, if any, larger than the additional profits received by the respondent in the breach of the contract and the chartering of the ships to others. By such act on its part it has received and has in pocket large gains, while, on the other hand, the libelant, without fault on its part, has been compelled to complete the defaulted contract with funds of its own, for which it has received neither principal nor interest. Under these circumstances, I am of opinion that interest on the entire amount should be allowed, to begin to run from November 1, 1917, and so report.

Kirlin, Woolsey & Hickox, of New York City, and Edward R. Baird, Jr., of Norfolk, Va. (John M. Woolsey, of New York City, of counsel), for libelant.

Carter & Carter and Harrington, Bigham & Englar, all of New York City, and Harry E. McCoy, of Norfolk, Va., for respondents.

WADDILL, District Judge (after stating the facts as above). The gist of the libelant's exceptions is that the commissioner erred in reporting the liability in its favor for the breach of the contract sued on, in the sum of $1,311,059.16, with interest from the 1st of Novem-

ber, 1917; whereas, the damages should have been assessed at $1,371,-325.40, with interest from July 31, 1917.

Briefly, the exceptant says: (1) That the commissioner erred in giving credit to the libelant for only $10,000 to cover operating commissions, gratuities, etc., in carrying out and performing the contract breached, when he should have allowed $70,266.24, making a difference of $60,266.24 against the exceptant. (2) That the commissioner erred in fixing the amount of tonnage that the libelant was entitled to have shipped under its contract with the respondent at 69,200 tons, whereas, under the facts of the case, it should have been 75,000 tons, making a balance of only 63,202 tons of nitrate not delivered by the respondent under the contract, and for which the commissioner held it liable, 5,998 tons having been delivered before the alleged breach of the contract sued on. (3) That interest should have been allowed as of the 31st of July, 1917, instead of November 1, 1917.

The respondents' exceptions are briefly to the effect that the commissioner erred in awarding damages to the libelant for the alleged breach of the contract in excess of the sum of $322,697.21, and that in no event should the award have exceeded $807,379.81. The specifications of objections are as follows: (a) That he treated the contract in suit as calling for the transportation of 69,200 tons of nitrate, instead of 67,500 tons, making a difference of 1,700 tons against the respondent; (b) that the commissioner erred in allowing damages on the basis of the cost of the hire of 14 ships employed specially to lift the tonnage between the dates of 23d of April, 1917, and 31st of December, 1917, covered by the contract between the parties, instead of upon the basis of all the ships employed by the libelant in the transportation of nitrates between said dates, and that there was no sufficient evidence to warrant the commissioner's finding that the 14 ships were specifically hired to carry the nitrates in question; (c) that the commissioner erred in assessing damages upon the basis of the cost of forwarding nitrates after the 23d of April, 1917, instead of upon the basis of approximately equal monthly shipments between December 1, 1916, and July 1, 1917; (d) that the commissioner erred in computing his damages upon the basis of $36.81 per ton, instead of $29.-19½ per ton, for the carriage of the nitrates in question; (e) that the commissioner erred in assessing the cost arising from the breach of the contract, by failing to take into account, during the same period in which the cargo in question was being lifted, that the libelant was engaged in transporting other large quantities of nitrates, and to apportion the cost of transporting the quantity to be carried under the contract in suit and the total tonnage shipped by libelant during said period.

These exceptions were elaborately argued, orally and in writing, and submitted, and after mature consideration thereof the court's conclusion thereon, having regard to the terms of the contract in suit, which are briefly as follows:

"The said party of the first part [Luckenbach Steamship Company, Incorporated] shall provide the said party of the second part [W. R. Grace & Co.] with freight room for seventy-five thousand (75,000) tons, 10 per cent. more or less at the option of the party of the first part, of nitrate and/or

ores between the 1st of December, 1916, and the 31st of July, 1917, as follows: * ·'· * The above-mentioned quantity to be divided as follows: About nine thousand (9,000) tons, 10 per cent. more or less, monthly; the party of the first part to have the right to take up to seventeen thousand (17,000) tons in any one period of sixty (60) days; all quantities and deliveries to be mutually arranged between the party of the first part and the party of the second part, to suit the steamers of the party of the first part"

—is that the report as a whole should be approved and confirmed. The commissioner has, in an able and exceedingly clear opinion, considered and passed upon the several questions presented for consideration, and the exceptions taken to his report by the parties respectively should be overruled; the court adopting his reasons and conclusions as its own regarding the several matters passed upon.

A decree overruling the exceptions and affirming said report will be entered on presentation.