## LUCKENBACH S. S. CO., Inc., et al. v. W. R. GRACE & CO., Inc.

(Circuit Court of Appeals, Fourth Circuit.   July 6, 1920.)

No. 1769.

1. **Estoppel** ☞63—**Party cannot at trial assign reason for breach different from that given at time of breach.**

   Where a shipowner assigned, as the only reason for its refusal to perform its contract to carry cargoes for libelant, a claim that the outbreak of the war with Germany had abrogated the contract, it could not, at the trial for breach of its contract, defend on the ground that the original contract was invalid for want of mutuality.

2. **Shipping** ☞58(2)—**Answer held not to allege want of mutuality of contract.**

   An answer, which set forth a provision of the contract that the quantities to be carried should be mutually arranged between the parties, merely for the purpose of explaining its failure to carry cargoes before the proclamation of war against Germany, is insufficient to raise the defense that such provision made the contract invalid for want of mutuality.

3. **War** ☞10(1)—**Domestic contract for carriage of contraband not terminated by war.**

   A contract between two domestic corporations for the carriage of cargoes of nitrates from South American ports to domestic ports was not terminated by the declaration of the war with Germany, though thereafter its performance was subject to greater hazards.

4. **Shipping** ☞51—**Danger of capture by enemy held not "restraint of princes," within charter party exemptions.**

   The increased danger of capture or destruction by German submarines, subsequent to the declaration of war between the United States and Germany, based on mere rumors of the presence of German submarines, and on the instructions to the submarines by the German government, is not "restraint of princes," within charter party exemption from liability.

   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Restraints of Kings or Princes.]

5. **Corporations** ☞459—**Owner of ships held liable for breach of contract by practically identical leasing corporations.**

   Where a corporation, which owned a number of ships, leased them to another corporation. which had a small capital stock, and which was controlled by the same officers and directors, and 90 per cent. of whose stock was owned by the same stockholders, at a rental which, though more than nominal, was far below the value of the ships, the owning corporation so far participated in the contracts of the leasing corporation as to be liable for their breach.

6. **Admiralty** ☞83—**Allowance of $5,000 to commissioner held not excessive.**

   An allowance of $5,000 to the commissioner, who took the testimony in a libel suit, in which the amount in controversy was large and the questions were of some difficulty and received thorough and painstaking examination, will not be set aside as excessive.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Libel by W. R. Grace & Co., Incorporated, against the Luckenbach Steamship Company, Incorporated, and another.   Decree for libelant (258 Fed. 49; 248 Fed. 953), and respondents appeal.   Decree affirmed.

Certiorari denied 254 U. S. ——, 41 Sup. Ct. 14, 65 L. Ed. ——.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Peter S. Carter and Oscar R. Houston, both of New York City (Carter & Carter, of New York City, Harry E. McCoy, of Norfolk, Va., and Israel A. Washburne, of New York City, on the brief), for appellants.

John M. Woolsey, of New York City (Kirlin, Woolsey & Hickox, of New York City, Edward R. Baird, Jr., of Norfolk, Va., and Harrison Lillibridge, of New York City, on the brief), for appellee.

Before KNAPP and WOODS, Circuit Judges, and WATKINS, District Judge.

KNAPP, Circuit Judge. The case in outline is this: On October 25, 1916, the appellant Luckenbach Steamship Company, a Delaware corporation, entered into a written contract with the appellee, W. R. Grace & Co., a Connecticut corporation, whereby the former agreed to provide freight room and carry for the latter, between December 1, 1916, and July 31, 1917, 75,000 tons, 10 per cent., more or less, at the option of the steamship company, of nitrate and/or ores from designated ports in Chile to a port of the United States Savannah-Boston range; the appellee agreeing to pay therefor $15.50, United States gold, per ton of 2,240 pounds, delivered. Under this contract the steamship company carried one cargo, of 5,998 tons, delivered at the port of New York about the 1st of May, 1917, and no more. In a letter to that company under date of April 21, 1917, the appellee asked to be advised of the position of certain steamers named, and when they would be ready to load with nitrate, and on the 23d, two days later, this reply was sent:

"Your letter of the 21st in reference to freight contract nitrate of soda received and contents noted. In answering the same, beg to inform you that we cannot carry out this freight room contract, which was supplemented by the usual form of nitrate charter party adopted and used by your company, and which usual form of nitrate charter party was made a part of the freight room contract, for the reason that a state of war exists between this government and the government of Germany, and we are released under article 13 of this nitrate charter party reading: 'The * * * enemies, pirates, * * * arrest and restraint of princes, rulers, and people, political disturbance or impediments * * * always mutually excepted.' "

Not long afterwards, on June 7, 1917, the appellee filed the libel and complaint herein, to recover damages for breach of contract, against the Luckenbach Steamship Company and the Luckenbach Company, charging the latter with liability because the two companies were "maintained and managed as one corporation," and alleging certain facts in that regard which presently will be stated. Accompanying the libel were a number of interrogatories, addressed to the respondents severally, which they were called upon to answer under oath. A monition was issued, as prayed for in the libel, and the marshal attached the steamer Florence Luckenbach, owned by the Luckenbach Company, and leased to the Luckenbach Steamship Company, which was then discharging cargo in the harbor of Norfolk, Va. A few days later the respondents entered a general appearance and filed

a bond, under which the steamer was released. In August following each of them filed an answer to the libel, and also answers to the several interrogatories.

To these answers the appellee filed exceptions, on the ground that the facts therein stated did not constitute a defense to the cause of action alleged in the libel, and on that ground the exceptions were sustained, as appears from the opinion of the learned District Judge filed in March, 1918. 248 Fed. 953. The order thereupon entered, however, granted the respondents 15 days in which "to answer over, or make such valid defense, if any they have, as they may be advised." On their failure to answer further within the time allowed, an interlocutory decree was entered, adjudging the respondents and each of them liable for the damages suffered by the appellee, and appointing a commissioner to ascertain the amount thereof, with directions to return "a report of his findings and conclusions, together with the evidence and exhibits upon which they are based."

In November, 1918, the commissioner submitted an elaborate report, in which he reviews the evidence at some length and fully explains his reasons for fixing the damages, as he does, at $1,311,059.16, with interest from November 1, 1917. Exceptions were filed by both parties, but all of them were overruled, and confirmation of the report ordered in a brief opinion, which quotes the report in full, filed in May, 1919. 258 Fed. 49. Final decree was entered accordingly, on June 26, 1919, from which the respondents bring this appeal.

With this recital of the proceedings in the court below, we pass to such discussion as seems to be appropriate of the various grounds on which the appellants ask reversal of the decree.

[1] 1. Is the contract valid?

The contention that it is not rests on this clause in one of the articles:

"All quantities and deliveries to be mutually arranged between the party of the first part and the party of the second part, to suit the steamers of the party of the first part."

And the argument is that thereby the contract was rendered so imperfect and incomplete as not to be enforceable, under the rule that a contract which leaves something for future agreement, though otherwise definite and certain, is not binding on the parties. It would be enough to say in reply that the steamship company makes no such claim in the letter of April, 1917, refusing performance, or in its previous correspondence with the appellee. On the contrary, it assumes in that letter, as it had before, that the contract was in all respects complete and valid, and would have to be carried out, except for the reason therein stated.

[2] Nor does the answer of the steamship company set up any such defense. True, the clause in question is quoted in the answer; but the allegations based thereon are merely to the effect that the company had many other commitments for its steamers, to which the performance of this contract had to be adjusted, as Grace & Co. well knew; that at the time the contract was executed it was impossible to tell

when the steamers would be released from such commitments; and that "from time to time after October 26, 1916, the time for this respondent to furnish steamships was discussed with the libelant, and such time was, from time to time, extended by mutual agreement until after the 6th of April, 1917." This discloses the purpose for which the clause was inserted in the contract, as plainly appears upon reading the entire provision from which the clause is taken. In short, there is no averment by the steamship company that the stipulation here referred to operated to release it from obligation.

But the further and equally conclusive answer is found in the settled rule of law that one who breaches his contract for reasons specified at the time will not be permitted afterwards, when sued for damages, to set up other and different defenses. This rule has been long established and frequently applied. Thus, in the leading case of Railway Co. v. McCarthy, 96 U. S. 258, often quoted and followed, the Supreme Court says, at page 267 (24 L. Ed. 693):

"Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and a different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law. Gold v. Banks, 8 Wend. (N. Y.) 562; Holbrook v. White, 24 Wend. (N. Y.) 169; Everett v. Saltus, 15 Wend. (N. Y.) 474; Wright v. Reed, 3 Durnf. & E. 554; Duffy v. O'Donovan, 46 N. Y. 223; Winter v. Coit, 7 N. Y. 288."

Other illustrative cases, among many, are Oakland Sugar Mill Co. v. Fred W. Wolf Co., 118 Fed. 239, 55 C. C. A. 93, Goodman v. Purnell, 187 Fed. 90, 109 C. C. A. 408, Polson Logging Co. v. Neumeyer, 229 Fed. 705, 144 C. C. A. 115, and Wall Grocer Co. v. Jobbers' Overall Co. (decided by this court January 12, 1920) 264 Fed. 71.

In its letter of April 23, 1917, above quoted, the steamship company placed its refusal to perform the contract distinctly and solely on the ground of "restraint of princes," and it cannot now be heard to say that it had some other excuse. The contention here considered is clearly untenable.

[3] 2. Was the Luckenbach Steamship Company released from its contract obligation by the proclamation on April 6, 1917, of the existence of a state of war between the United States and Germany?

We are of opinion that this question should be answered in the negative. The contract is between domestic corporations, one of Delaware and the other of Connecticut, and covers the transportation of nitrate from a neutral country to a port in the United States. The outbreak of war with Germany did not make this contract illegal as matter of law, or impossible of performance as matter of fact. The carriage of contraband is not per se unlawful, nor is it rendered unlawful by the circumstance that it may be attended with risk. As the Supreme Court says in Northern Pacific Ry. Co. v. American Trading Co., 195 U. S. 439, 465, 25 Sup. Ct. 84, 92 (49 L. Ed. 269):

"The contract was not unlawful when made. It may be assumed that the lead was contraband of war, but that fact did not render the contract of transportation illegal nor absolve the carrier from fulfilling it."

On this point it is sufficient to observe that the contract in question carries no implication of dependence on the continuation of peace, and therefore was not in anywise affected by the subsequent declaration of war. This being so, we might properly reject without further comment the appellants' contention that the contract was abrogated by the war proclamation. Seventeen days after that proclamation was issued, the steamship company took the position, evidently with deliberation, that the state of war which had then come into existence operated ipso facto to release it from obligation, even though that state of war made performance of the contract in no respect more difficult or dangerous. On the principle declared in Railway Co. v. McCarthy, supra, and many cases of like import, the company was thereby precluded from assigning any other or different reason for breaking the contract. That is to say, its election to stand on the proposition of law estopped it thereafter from setting up matters of fact in defense of its action.

[4] Aside from this, however, we are constrained to hold that no facts are alleged in the answers which would justify refusal to carry out the agreement. The most that is said in that regard appears in the answer of the steamship company to this interrogatory:

"Please state in what manner you claim that the existence of a state of war between the United States government and the government of Germany operated to affect your contract of October 26, 1916, with the libelant."

Omitting immaterial parts, the answer is as follows:

"After the existence of the war between the United States and Germany, American steamships, and particularly those carrying Chilean nitrate and other contraband of war from South American ports to United States ports, were liable to capture or destruction by German warships, both under the established rules of international law and under the rules and instructions of the German government. The presence of German submarines in, or in the neighborhood of, trade routes between South America and the United States, was rumored and suspected at various times subsequent to the entry of the United States into the war against Germany, and this respondent reasonably feared that its vessels carrying Chilean nitrate to the United States would be liable to capture or destruction by German war vessels."

It seems clear to us that this general allegation, which recites no facts and rests its conclusion upon nothing but rumor, comes far short, under all the authorities, of stating a case of "restraint of princes," or otherwise setting up a defense to the action. And the specious character of the plea, if not its insincerity, is made manifest by the fact, admitted by the steamship company, that on the 28th of April, five days after breaking its contract with appellee, it chartered a vessel to another party, to carry a cargo of nitrate from Chilean ports to the United States, at $29 per ton, and less than a month later chartered two more vessels to different parties, also to carry nitrate from Chilean ports to the United States, in one instance at $33 and in the other at $34 per ton! In view of these and other admissions in its answers to the libel and interrogatories, we need not argue further that the steamship company fails to show any valid excuse for refusing to perform its contract.

[5] 3. Is the Luckenbach Company liable for the default of the Luckenbach Steamship Company?

From the statements and admissions in their respective answers these facts appear: The Luckenbach Steamship Company has a capital of only $10,000. The Luckenbach Company, also a Delaware corporation, is capitalized at $800,000. They have the same directors and the same officers, and Edgar F. Luckenbach, who was president of and personally managed both companies, owns 94 per cent. of the stock of the Luckenbach Steamship Company, and almost 90 per cent. of the stock of the Luckenbach Company. The latter company owns all or most of the steamers referred to in the record, some eight or nine in number. By contracts of May 1, July 1, and October 1, 1915, copies of which are annexed to the libel, these steamers were leased to the steamship company for terms running into the year 1926, and upon terms which, though something more than nominal, are obviously far below their rental value.

Putting aside any inquiry into the motive for this arrangement, we think it too plain for serious question that the facts here considered show such identity of the two corporations, or at least give rise to such a strong presumption of their identity, as warrants the conclusion that the Luckenbach Company is equally responsible with the steamship company for the breach by the latter of its contract with the appellee. For all practical purposes the two concerns are one, and it would be unconscionable to allow the owner of this fleet of steamers, worth millions of dollars, to escape liability because it had turned them over a year before to a $10,000 corporation, which is simply itself in another form. We have only to add that on this issue the case is covered by our recent decision in The Willem Van Driel, Sr., 252 Fed. 35, 39, 164 C. C. A. 147, 151, wherein it is said:

"The elevators were constructed and operated merely as a facility to the business of the railroad company. Applying the language of Judge Wallace in Lehigh Valley Railroad Co. v. Du Pont, 128 Fed. 840, 64 C. C. A. 478, the potential and ultimate control of all its property and business affairs of the elevator company was lodged in the railroad company, and this control was exercised as completely and as directly as the machinery of corporate organisms would permit. Such complete dominance and control by the railroad company made the elevator company its mere puppet. United States v. Del., Lack. & West. R. R., 238 U. S. 516, 35 Sup. Ct. 873, 59 L. Ed. 1438."

4. To what damages is the appellee entitled?

We reply to this question by adopting the commissioner's report, which was approved and confirmed by the court below; and as it is quoted at length in the opinion of Judge Waddill, in 258 Fed. 49, it need not here be reproduced. This report, in our judgment, states fully and fairly, and answers convincingly, the several contentions of appellants respecting the measure of damages, and we find no occasion to add anything to what is therein so clearly and ably said. It is enough to repeat the paragraph with which the report closes:

"The answers to the interrogatories filed as a part of the record in the case fully sustain the foregoing conclusions, and except for the fact that the respondent declined to offer any evidence, it is not too much to say that the record doubtless would have shown that even the large amount of damages

here allowed were but little, if any, larger than the additional profits received by the respondent in the breach of the contract and the chartering of the ships to others. By such act on its part it has received and has in pocket large gains, while, on the other hand, the libelant, without fault on its part, has been compelled to complete the defaulted contract with funds of its own, for which it has received neither principal nor interest."

[6] 5. Was the commissioner overpaid?

The commissioner was allowed a fee of $5,000, and appellants allege that this "is not reasonable—it is exorbitant—for the services rendered." But the case involves an unusually large amount, besides questions of some difficulty, and the report shows that it received the most thorough and painstaking examination. Taking all the circumstances into account, we are not prepared to say that the compensation awarded is in any sense excessive, and the contention to the contrary must be held without merit.

The decree appealed from is right, and will be affirmed.