Samuel C. Oolemak, J.
Two clauses of the agreements, it seems to me, dispose of the controversy between the litigants. *783 The first is contained in the consolidation agreement of March 21,1947, subdivision V of article First, and the second, in clause Fourteenth in each of the separate leases of the same date. The provision in the consolidation agreement defines “ Gross Receipts ” upon which the percentage rental amount was to be paid (in addition to a fixed rental) as follows: “‘gross receipts ’, as used in this agreement, shall be deemed to include all income and revenue arising from the operation of each of the demised premises, less such gross receipts taxes as may be levied, imposed or assessed against such gross receipts, including all receipts of whatsoever kind derived from each of said demised premises, and without limiting the generality of the foregoing, shall include: (1) all box office receipts excluding taxes on admissions; (2) all rentals and/or income derived from apartments, stores, offices or rentable space contained in said theatres, and all income derived from concessions and advertising; (3) all net receipts derived from the sale of admission or coupons outside of the box office.”
The other clause deals with subletting and assignment: ‘ ‘ The Tenant shall be permitted to freely assign this lease or sublet the whole, or any portion of the demised premises, together with all the equipment and appurtenances thereunto belonging, and may freely mortgage, pledge and hypothecate the same, subject to the lien(s) or prior existing mortgage(s), if any, and subject to any future mortgage obtained by the landlord, in an amount not exceeding the amount permitted to the landlord by this lease, without the written consent of the Landlord, provided, however, that notwithstanding any assignment, subletting or mortgage, the Tenant shall still remain liable for the faithful performance of all of the provisions of this lease, and shall continue liable for the rent, as though no assignment or subletting or mortgage had been made ’ \
The controversy revolves upon the manner in which sales of candies and refreshments are to be computed to determine the percentage rental. It arises as follows:
The plaintiffs, landlords, leased four theatres to the defendant Metropolitan by the consolidation agreement and by four separate leases, one for each theatre. Metropolitan sublet to the defendant Skouras. Skouras entered into a “ concession agreement” with the defendant Circuit Vendors, Vendors paying a fixed annual amount for the candy and refreshment concession. The amount Skouras received from Vendors it paid to Metropolitan, and Metropolitan in turn paid the plaintiffs the appropriate percentage on the amount received. The percentage was 20% for each of the years in question (art. *784 First, III [A], of the consolidation agreement). Metropolitan paid this amount on the assumption that the annual concession fee it received from Skouras was ‘ income derived from concessions.” But, say the plaintiffs, there was no concession in fact from Skouras to Vendors; Skouras received for itself the full receipts from the sale of candy and refreshments and Metropolitan should have reported those receipts to the plaintiffs and paid the proper percentage on them, that is, 20%, as part of “ all receipts of whatsoever kind derived from each of said demised premises ”. I agree with the plaintiffs.
Vendors is a wholly-owned subsidiary of Skouras, organized by Skouras and having only a nominal capital. It exists only in name; it does not maintain its own organization; it has no independent corporate life; apparently there has been only one formal meeting of Vendors,— the organization meeting; there are no minutes of any contractual or financial arrangement between Skouras and Vendors, although they were borrowing and lending one another large sums; no minutes on how Vendors was to carry on the candy and refreshment business. The executive officers of Vendors who were also officers or directors of Skouras received their compensation from Skouras,— nothing from Vendors; the managing employees of Vendors received their compensation from Skouras. Vendors limits its “ activities ’ ’ to the Skouras theatres; those ‘ ‘ activities ’ ’ in turn are limited to purchasing the candy with funds “ borrowed ” from Skouras; Vendors keeps no records of the cost of operating the refreshment stands. The actual operations of the display and sale of candy were carried on in the theatres by the regular staff of Skouras theatre employees, who were paid by Skouras, because this method was considered more advantageous to Skouras. “We all in the business ”, George Skouras said on his examination before trial, speaking of terminating an arrangement with an existing bona fide concessionaire, “ felt that we would do substantially more if we ran [it] ourselves rather than through a concessionaire ’ ’. The decision to terminate the existing concession and to interpose Vendors was Skouras’ decision, he added, although nominally Vendors was to buy out the concessionaire paying with funds borrowed from a bank, repayment to the bank being guaranteed by Skouras. Indeed, there was no ‘ ‘ concession ’ ’; Skouras ‘ ‘ ran it themselves ” using the name of Vendors whose corporate existence for present purposes should be ignored. (Cf. Rapid Tr. Subway Constr. Co. v. City of New York, 259 N. Y. 472, 487, 488; Berkey v. Third Ave. Ry. Co., 244 N. Y. 84, 94; Anderson v. Abbott, 321 U. S. 349, 361, 362; Hollander v. Henry, 186 F. 2d *785 582, 584, 585; Luchenbach S. S. Co. v. Grace & Co., 267 F. 676, 681; Lehigh Val. Ry. Co. v. Dupont, 128 F. 840.)
"What, then, are the consequences? If we ignore Vendors,— Skouras was selling its own candy and was receiving “ gross receipts ”, and those receipts should have been reported by Metropolitan to the landlords. If there had been no sublease to Skouras, Metropolitan would have been required to pay a percentage of the gross receipts on the candy sales as part of the rental and, by reference to clause Fourteenth in the separate leases, the interposition of Skouras does not diminish Metropolitan’s liability: “ Notwithstanding any * * * subletting, the Tenant shall still remain liable for the faithful performance of all of the provisions of this lease, and shall continue liable for the rent, as though no * * * subletting * * * had been made.” To be sure, if Metropolitan, without subletting, had granted a bona fide concession, its liability to the plaintiffs would have been limited by what it received; the lease so provides: ‘ ‘ income from concession ’ ’. And we may assume the result would be the same if Skouras had granted a bona fide concession; that is the defendants’ position and, similarly, the plaintiffs’. Indeed, the defendants in their brief say that ‘ the only question in this case that could be raised would seem to be whether the said license concession fees provided in the agreements between Circuit Vendors and Skouras were, as alleged in the answer “fair and reasonable” under all the circumstances, and ‘ arrived at fairly and equitably and in good faith and in accord with standard practice and usage in such business ”. But that question cannot arise here as there was no concession.
Metropolitan cannot say that if there were no concession it would not have had to pay on the basis of “ gross receipts ”. If not on that basis, I do not know on what basis it would have paid; there would have been no measure for determining the amount to be paid on the sale of candy and refreshments and Metropolitan would have had a source of income ‘ ‘ from the operation of each of the demised premises ” without paying anything for it. And, since by hypothesis there is no concession, what the plaintiffs are to receive from Metropolitan is the proper percentage of all “ gross receipts ” under the lease to Metropolitan from the operation of the theatres, irrespective of who operates them. The definition of ‘ ‘ gross receipts ’ ’ is broad; “ all receipts of whatsoever kind derived from each of said demised premises”; broad enough to cover candy and refreshment receipts.
*786 That the basis for determining the percentages is as I have suggested can be seen from the method of procedure and the course of business. Skouras would report to Metropolitan, giving the precise figures for the several categories under ‘ ‘ gross receipts ’ ’ and Metropolitan would transmit the very same figures to the landlords. At the end of each accounting year a firm of certified public accountants would audit the books of the theatres for Skouras and, would make its report to it; Skouras would transmit the report to Metropolitan which would send it to the plaintiffs. Adjustments in payments would be made as the audits called for. Seven such reports are before me. They contain ‘ a statement showing the ‘ gross receipts ’ of these theatres, according to our understanding [the accountants’] of the term ‘gross receipts’ as defined in the consolidation agreement.” These are the very figures upon which Metropolitan paid the plaintiffs. In four of the reports the final figures showed that the plaintiffs were entitled to additional amounts and Metropolitan paid these; in three of them there had been overpayments and Metropolitan asked for and received their return. That is to say, from Metropolitan’s own standpoint, what it acknowledges it is obliged to pay was determined by what was actually received from the operation of the theatres and by reference to its own leases with the landlords, the plaintiffs. The accountants’ reports list all items of “ gross receipts ” and include in it “ License fees for concessions ” according to their “understanding”. The gross receipts from the sale of candy are as readily determined as the gross receipts from the sale of tickets — the very figures are before me,— and whether those figures should have been included, or only the amount received from a concession, depends on whether there was a concession.
I pass over rapidly the contention of the defendants that it would be ‘ ‘ unfair ’ ’ to consider gross receipts from the sale of candy instead of some percentage (they do not say what) under the “concession”. Rental may be based on a fixed percentage of gross receipts from many sources; here, among other things, it was a fixed percentage of gross box-office receipts, without regard to what net profit may have resulted to the theatre as the result of deductions from gross; and I do not see why the same factors should not apply to gross receipts from candy, refreshments or any other commodities which the theatre may undertake to sell. A bona fide concession may reflect the approximate net profit from the sale of candy and so could properly be considered income from concessions. *787 Whether “ gross receipts ” applied to sales of candy would make such an undertaking profitable is a matter for bargaining, and in any case there is nothing to show that it is unprofitable. Moreover, as I have said, the alternative is to have the Metropolitan pay nothing on receipts from such sales.
Of course, Metropolitan was aware of the situation; it owned 50% of the stock of Skouras; the other half was owned by three Skouras individuals, some of whom were among the executive heads of Metropolitan. And Skouras knew the terms of the leases to Metropolitan. Moreover when the pre-existing bona fide concession was terminated Vendors “undertook” to pay the concessionaire a very substantial amount. The money was borrowed from a bank, Skouras guaranteed the loan and Metropolitan guaranteed payment to the concessionaire of the amount.
As for Metropolitan alone it owed the amount sued for under its own contract and it is liable for the full amount. It simply did not report the full amount it had agreed to report, whether or not it made use of a device to conceal that amount. Good faith and fair dealing on Metropolitan’s part required it to refrain from doing anything whether by itself or in concert with others, that would tend to diminish its obligation to the plaintiffs. (Kirke La Shells Co. v. Armstrong Co., 263 N. Y. 79; Wilson v. Mechanical Orguinette Co., 170 N. Y. 542.) And yet it did just that. It and the other defendants knowingly participated in an arrangement which had the very effect of depriving the plaintiffs of what was due them. And from that standpoint the other defendants are equally liable with Metropolitan (cf. Keviczky v. Lorher, 290 N. Y. 297). Indeed, the defendants make no point that each one can or should be treated separately or differently; they stand or fall together. The total amount is $201,851.09 and there will be judgment for the plaintiffs for that amount, with interest, against all defendants. This disposes of the first and second causes of action, the second largely repetitious of the first.
The third cause of action is dismissed. Plaintiffs have an adequate remedy at law and are being given that remedy in this very action. The fourth, fifth and sixth causes of action are not before me.
The seventh cause of action is dismissed. It was sustained as stating a cause of action (Hempstead Theatre Corp. v. Metropolitan Playhouses, 308 N. Y. 712) on an extremely broad definition of ‘ ‘ gross receipts ’ ’, but the proof fails to support it. The claim is for an additional percentage of ‘ ‘ gross receipts ’ ’ based upon the receipt by Skouras of nearly $600,000 *788 in settlement of an action brought by Skouras and others against Loew’s Theatres for damages under the antitrust laws. The claim against Loew’s was for nearly $25,000,000 (before being trebled); it involved many theatres, some operated by other subsidiaries of Skouras, some of them in New Jersey. The settlement agreement contains specific provisions relating to 15 theatres, none of which is involved in this litigation, and the money payment of $600,000 was a lump sum payment, without reference to any one theatre or to the validity of any claim of a given theatre. It is impossible to say what amounts are allocable as “ gross receipts ” of the theatres in question here.
The eighth cause of action asks for a declaratory judgment. It, too, should be dismissed. The plaintiffs stand in no need of such relief. At the trial the defendants conceded the plaintiffs’ position and withdrew their defense to it, so that no controversy now remains. In such a case the court’s discretion should be exercised against granting a declaratory judgment.
The ninth cause of action was discontinued, without prejudice.
There is no merit to the ‘ ‘ partial defense ’ ’ that the plaintiffs ratified and confirmed what the defendants did by receiving and accepting an annual accounting statement from the certified public accountants of the defendants. Of course, the plaintiffs received such reports and superficially they were accurate. They reported receipts from a “ concession ”. There was no concession; but the plaintiffs did not knew that fact nor did they know what steps had been taken to conceal it from them until much later. When their suspicions were aroused as to the relation between Skouras and a supposed concessionaire, they began to make inquiries but for a long time they were fobbed off by the defendants in their efforts to learn the facts.
(Supplemental Opinion.)
This is an application by one of the defendants ( Civ. Prac. Act, § 568) to be permitted to file an appeal bond in less than the full amount of the judgment. The judgment is for $253,957.46 and the defendant Metropolitan asks that the bond be fixed at $50,000. The court’s discretion is invoked. We start with the premise that a judgment creditor should be given the protection of his judgment so long as it is outstanding and that the burden really is on the judgment debtor to show that there will be no prejudice if less than the amount of the judgment is adequately secured pending appeal. I do not believe that Metropolitan has shown enough to warrant granting its application. In the last analysis the application rests upon the *789 asserted value — and value not as of the present time but in 1954 — of certain fee interests belonging to Metropolitan. The statements relating to that value are either conclusory in import or, where presented as statements of fact are inconclusive.
The motion is denied.