## Case No. 4,519.

ERLEN v. The BREWER.

[35 Hunt, Mer. Mag. 716.]

Circuit Court, S. D. New York. Oct. 3. 1855.[1]

---

[1] [Reversing Case No. 4,519a.]

NELSON, Circuit Justice. The libel in this case sets out a charter party between the libelant [John C. Erlen] and the owner, bearing date the 16th June, 1853, by which the ship Brewer was chartered for a voyage from the port of New York to Melbourne, Australia, upon certain terms and conditions therein specified. That the libelant took possession of the vessel with the knowledge and assent of the owner, and has never since relinquished the same. That by the terms of the contract, he, the libelant, was bound to man, victual, and navigate the said ship at his own expense, and by his own procurements, whereby he became owner of the vessel during the time covered by the charter party, and had expended large sums, and much time, and had incurred heavy responsibilities in and about the procurement of passengers, and outfits for the ship, her crew and passengers, and had entered into contracts of affreightment for the outward and homeward voyage. That the libelant is disturbed, hindered, and molested in his possession of said ship, and in putting her cargo on board, and in the enjoyment of his rights, secured to him under the charter party, by a person placed on board by the owner, as master, and who, as such, is bound to obey the instructions of the libelant, according to the terms of the contract, but refuses to obey the same, and is upheld and encouraged in the disturbance and molestation of the possession by the owner. The libel then prays a decree for the possession, or damages for withholding it. The answer admits the charter parties as set out; and the complaint alleges that the delivery was conditional, and to become absolute only in case the owner (the respondent in the suit) should, after inquiry for that purpose, be satisfied as to the sufficiency of one Samuel D. Jones, who undertook, by an indorsement on the charter party, to guaranty performance on the part of the libelant, the charterer; and that it was understood and agreed at the time of the execution and delivery, and the guaranty was not to be considered sufficient till the respondent should declare his satisfaction with the responsibility of Jones, and that being unable to obtain any reliable information as to his responsibility or sufficiency, notice was given to the libelant the next day (the 17th June) of the insufficiency of the guaranty; and that he then and there agreed to procure other person or persons to secure the performance on his part to the satisfaction of the respondent, but wholly neglected and failed to do so. The answer, also, denies that the possession of the ship was delivered to the libelant, or to any person on his behalf; but alleges that the charter became null and void on account of the nonfulfillment of the covenants on the part of the libelant. Among the covenants in the charter party, the charterer agreed to pay the owner of the ship for the charter during the voyage, $1,200 per month, and to pay all the wages of the master, officers and crew; also, all foreign port charges, including consul's fees, wharfages, and pilotage, and to furnish sufficient provisions and water for the use of passengers and crew, and all incidental expenses (except repairs) during the voyage, one thousand dollars to be paid on the 20th of June, two thousand at the expiration of sixty days, four thousand on the arrival of the ship at Melbourne, or in New York within thirty days after advices of her arrival, and the balance on the arrival and discharge of cargo in the United States. There is also this further covenant:—"And it is also understood and agreed that this charter party shall be guarantied to the entire satisfaction of the party of the first part." The charter party was signed and delivered on the day it bears date, June 26, 1853, and underwritten the signatures, is the following:—"I hereby guaranty the fulfillment of the within contract. New York, June 16, 1853. Samuel D. Jones. Witness, B. E. Arrowsmith." And also the following indorsement:—"This charter party commences on the sixteenth instant. New York, June 16, 1853. J. N. M. Brewer."

This statement of the pleadings and parts of the charter party will be sufficient to present the material questions involved in the case. The first case, and which concerns the merits of it, whether or not the owner agreed, either expressly or by necessary implication, from his silence at the execution and delivery of the charter party, to accept Jones as guarantor within the covenant. This is a question of fact, and must be decided upon the weight of the evidence. Edwin R. Jones, the broker who negotiated the charter for the libelant, with B. E. Arrowsmith, a broker, on behalf of Brewer, the owner, states that he was present when the guaranty was signed by Jones; that Brewer was present, and that the witness proposed at the time that the parties should go to the Atlantic dock, where the ship lay, and put her in possession of the libelant; that Brewer said that he would not go at that time, but assigned no other reason; that the witness then proposed that he should put on the charter party some stipulations

that would answer the same purpose, which he agreed to, and wrote the indorsement signed by him, which we have already referred to. He further states that when the writings were completed, he inquired of all the parties if they were satisfactory, and all agreed that they were, and that no dissatisfaction was expressed by Brewer. Sylvanus Pickering, a commission merchant, was present and concurs, substantially, with Ives; also, McLorid, clerk of the libelant, and R. H. Lockwood, who was present. The latter was to be supercargo of the ship in her voyage to Australia. At the time of the execution and delivery, a draft by the libelant, accepted by Jones, the guarantor. for $2,000, payable in sixty days, was given to Brewer, to cover the second payment, and a receipt given for the same. B. E. Arrowsmith, the broker on the side of the owners in the negotiations, states that when they went to the office of the libelant, where the charter party was executed, he met the latter at the entrance of the inner office; that he and Brewer conversed together on the subject; and that Brewer stated that he did not know about Jones. The libelant said it should be made satisfactory. It was all right in regard to Jones. The conversation had been that other security should be given, if required. He admits that when the draft was handed to Brewer, and he had signed the receipt, the libelant asked if it was all satisfactory, and the former answered in the affirmative; but the witness states that Brewer sent him the same day to the libelant to say to him that the matter was not satisfactory; he said that he should endeavor to get other names as security, and advise him as soon as possible. Other names were offered, but on inquiry were rejected. The witness also states that he made inquiries about Jones, and could not get anything satisfactory concerning him. Brewer authorized this witness, as late as the 21st and 22nd of June, to accept sufficient security, and carry into effect the charter party, but refused to give up possession of the ship till the security was given.

This is the substance of the testimony bearing upon the main question involved, except it has been shown by evidence in this court that the libelant was insolvent at the time he entered into the charter; and I can find nothing in the proofs, either in the court below or in this, to show that Jones was a man of any responsibility. It is quite clear, therefore, that whatever may have been the form and solemnities with which this contract was entered into, and even, if in a way to bind, in judgment of law, the parties, so far as Brewer, the owner, is concerned, there has been, in reality and substance, no fulfillment of the most material covenant in his favor, on the part of the charterer. The guarantor, for aught that appears, was a man of straw. and the charterer himself insolvent. This inference against Jones is not a harsh one; for after the evidence that inquiries had been made, and nothing satisfactory could be obtained concerning him, the burden lay upon the libelant to show that he was a man of responsibility. I admit he may rest his case, as he has, upon the agreement of Brewer to accept him as satisfactory, whether possessed of any responsibility or not; but if there is any doubt about this agreement upon the testimony, the fact of his want of responsibility is an element that cannot be overlooked. The equity and justice of the case must have its weight in deciding the question. The importance of this evidence was, no doubt. fully appreciated by the learned counsel for the libelant. and the omission to produce it leaves the unavoidable inference that it was in his power.

The case then, on the part of the libelant, must be upheld, if upheld at all, upon the naked fact that Brewer agreed to accept Jones as security, whether of any responsibility or not,—either supposing at the time, that he was, or so indifferent to his interest that he would not take the trouble to make inquiry. The witnesses examined for the libelant go far to establish this view of the case. But they do not directly nor even by necessary inference. No one of them ventures to say that Brewer expressed himself satisfied with Jones as guarantor or surety, or anything to that effect. They speak in very general terms on the subject,—that it was all satisfactory, appeared to be perfectly satisfied, expressed no dissatisfaction, and the like. But I agree, taking into consideration the execution of the charter party, the indorsement of Jones as surety, and of Brewer, as the time when the articles were to commence, in connection with the evidence of satisfaction expressed by him at the time, would be sufficient to foreclose the case, if there was nothing else in it. The conclusion would be irresistible that he had agreed to accept Jones as satisfactory. Arrowsmith, however, who knew as much about this transaction as any one, being the broker of Brewer, states that in an interview between the parties, just previous to the meeting to execute the articles, Brewer expressed his doubts as to the responsibility of Jones; and that thereupon the libelant promised that it should be made satisfactory, and added that it was all right in regard to Jones. Now, it was after this assurance and representation by the libelant, that the articles were executed and delivered, and the expressions of satisfaction made. What strengthens the evidence of this witness, and shows that he could not well be mistaken, he states that, afterward, on the same day, Brewer sent him to the libelant to say that Jones was not satisfactory, and that he thereupon promised to get other names, and others were subsequently furnished, but rejected as insufficient.

This evidence explains the expression of satisfaction of Brewer at the time of the execution of the charter party, as the question of the sufficiency of the surety was left open between the parties, and the instrument not to be binding, which is the fair inference, till the matter was determined. This explains, also, the taking of the draft accepted by this same man Jones, and receipt given, as the whole was to be dependent upon the event of the satisfactory security. It has been said that there is a great preponderance of witnesses in favor of the libelant on the question of the acceptance of Jones. But this is a mistake. There is no discrepancy between these witnesses and Arrowsmith. The interview between the parties when he was present, was at a different period of the transaction, and of which they had no knowledge. There is no contradiction of this witness.

Take the case, therefore, in any aspect in which it can be properly presented, and the libelant must fail. There was either a false representation of the pecuniary ability of Jones to induce Brewer to accept him, or there was an understanding between them that other names should be procured, and that the articles should be considered open till this matter was determined.

This case is somewhat interesting. A party utterly insolvent, with a friend as surety for him, equally irresponsible, undertakes to charter a ship for passengers and freight to Australia for large hire, agreeing with the owner in the charter party that its fulfillment shall be guarantied to his entire satisfaction. The articles are entered into, and formally guarantied by his friend in the presence of his clerk, broker, and person appointed supercargo of the ship, all of whom, with another witness, are called to prove that it was agreed this friend should be considered satisfactory. No proof is offered of his pecuniary ability, but from the course of the trial, on the contrary, it was conceded that he was a man of straw; and the case put upon the naked fact of the acceptance of this sort of security. In addition to this, a payment of two thousand dollars of the hire of the vessel is sought to be made by a draft at sixty days, drawn by the charterer, and accepted by the same friend. The thousand dollars that were to be paid in a few days was more embarrassing; when called on for that sum, it was not paid, for the reason, as assigned, that he had not finished his contracts for freight and, therefore, had not the money. This is not an isolated case. Other vessels have been chartered for these gold regions, that have come under our notice, evincing similar ingenuity, and financial skill; but unfortunately, the enterprise was not checked as early as the present one. Plausible and specious as has been the attempt here to get the possession and money upon her freight and passengers, it is impossible not to see, if it had been successful, the trans-

action must in all human probability have resulted in a fraud, either upon the ship owners or passengers, or both. The whole capital out of which to hire and bear the expenses of the ship during the voyage was dependent upon the fare and freight. If the libelant could have got possession of the ship, he probably might have procured passengers, and received passage and freight money, but whether the owner would have received the hire for his ship, or the passengers reached the gold regions of Australia, is not so certain. The ship itself was all the security of either for the undertaking, or any undertaking, entered into by the libelant in connection with the enterprise.

I am also of opinion that the libelant had not at any time, or for any time, acquired the actual possession of this vessel under the charter party; and if the question had become material, I should have deemed further inquiry necessary to satisfy me that the court of admiralty had jurisdiction of this case. But I do not go into this question, and prefer placing the decision upon the grounds above stated.

As the decree below [Case No. 4,519a] was for the libelant, I must reverse it, and direct a decree for the respondent, with costs.