### AMERICAN HAWAIIAN S. S. CO. v. WILLFUEHR et al.

(District Court, D. Maryland. June 29, 1921.)

No. 719.

1. **Contracts ⬳32—Verbal agreement binding, though intended to be reduced to writing.**

   In the absence of statutory provision to the contrary, parties may become bound by a verbal agreement though both intend that it shall be reduced to writing and signed.

2. **Shipping ⬳52—Charter not invalidated by refusal of charterer to perform condition.**

   Where a verbal agreement for a charter provided that the charterer should pay over a certified check when the formal charter party was signed, it cannot relieve itself from the obligation of the contract by refusing to do so.

3. **Admiralty ⬳12—Oral charter maritime contract.**

   An informal charter, made orally, is a maritime contract, over which a court of admiralty has jurisdiction.

In Admiralty. Suit by the American Hawaiian Steamship Company against Herman A. Willfuehr and Herman S. Willfuehr, trading as the American Fuel & Shipping Company. Decree for libelant.

Janney Stuart & Ober, of Baltimore, Md., and Kirlin Woolsey, Campbell, Hickox & Keating, of New York City, for libelant.

Macklin, Brown, Purdy & Van Wyck, of New York City, and Lord & Whip, of Baltimore, Md., for respondents.

ROSE, District Judge. The libelant says that the respondents by word of mouth chartered the steamship American to carry coal from New York to Rotterdam, and then repudiated their agreement. After some delay, the ship was rechartered to others at a somewhat lower rate, and the libelant here seeks to recover for the loss caused by the breach.

---

⬳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

On the morning of August 25, 1920, a shipbroker, learning that respondents wanted a ship, told their manager that he could get one, and, shortly after, that the American could be obtained. Thereupon the manager made in writing a "firm" offer for it. This the broker submitted to libelant's broker. Some of the terms were unsatisfactory, and counter propositions were made. Negotiations between the brokers, each during the time in immediate touch with his respective principal, followed, culminating in an agreement that the respondents would take the ship, on the revised November form of charter party, at $13.50 per ton, if the ship was ready for loading by Friday, August 27th, and, if she was not, at $13.25. The ship was to take 6,000 tons, 10 per cent. more or less, at owner's option. The charterer was to pay over a certified check for $10,000 upon the signing of charter party. The broker then asked the manager where the ship should report, and he was told to send it to the foot of India street, Brooklyn.

It was then about 2 or 2:30 in the afternoon of the 25th. The broker immediately reported the closing of the deal to the libelant's broker, who prepared a formal charter party, and the respondents' broker took it to their office. After he had read it over, the respondents' manager admitted that it was what had been agreed to, but he said he could not give a check until his partner came in, meaning apparently one of the respondents. He also indicated that he was annoyed by the check requirements. He called in a business friend, and had the latter read over the charter, and the latter also commented adversely upon the check proviso. As the so-called partner did not come in, the charter was left with the respondent's manager. The next morning the two brokers together visited the respondents' office, and at that time respondents' manager definitely refused to sign the charter or to go on with the transaction.

The version above stated is that of respondents' broker, or at least the broker who was not acting for the libelant. It was corroborated by the libelant's broker on all points as to which his knowledge could be expected to go. In a number of respects it is contradicted by respondents' manager. If he is accurate, he could have been confirmed in the more vital particulars by the business friend who, at his request, examined the draft charter, but no explanation of the failure to produce that gentleman has been made. After seeing the witness who did testify, I feel myself unable to accept the respondents' account of the transaction.

Even so, they say they are not liable because (1) the parties did not intend the bargain to be obligatory until a formal charter party was signed; (2) because the libelant would not have been bound until respondents' certified check was given, and that therefore there was no mutually binding obligation on either of them; and (3) that at the most it was not a charter, but a mere agreement to make one, over the breach of which admiralty has no jurisdiction.

[1] Of these in their order. In the absence of statutory provision to the contrary, men may become bound by what they say to each other, although they both intend that their agreement shall be reduced to writ-

ing and signed, but the burden of proof that such a bargain was made, although no writing was ever executed, rests somewhat heavily upon him who asserts it. Steamship Co. v. Swift, 86 Me. 248, 29 Atl. 1063, 41 Am. St. Rep. 545. In the instant case that burden seems to have been sustained. The direction of the respondents' manager to send the ship to the foot of India street, in connection with everything else which took place, shows that he regarded the matter as settled.

[2] 2. Respondents' second contention depends upon a deduction which their learned advocates draw from such cases as Erlen v. The Brewer, 8 Fed. Cas. 768, No. 4519, and The H. W. Edye, 12 Fed. Cas. 1104, No. 6,964, in which it was held that, where an owner had stipulated for a guarantee from the charterer, he is not bound unless or until it is supplied. The argument here made confuses a contingency which must happen before a contract is made with a term of the contract requiring one party to do something before he can insist on performance by the other.

[3] 3. From what has already been said, it would appear that what the parties actually did here was to make an informal charter, and over that the jurisdiction of the admiralty extends. The Tribune, 24 Fed. Cas. 191, No. 14,171. The evidence seems to show that the loss of the libelant, through delay, lower freight rates, extra port charges at Philadelphia, to which they had to go, increased amount of bunker coal they had to consume, etc., amounts to $9,125, and unless some question shall be made of these figures, the libelant will be entitled to a decree for that amount.

⬤=For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes