253 F.2d 395
 Charles GARDNER
v.
THE CALVERT, Her Engines, Machinery, Tackle, Fittings,
Equipment, etc., and Ernest E. Fuchs and Sound
Steamship Lines, Inc., and All Other
Persons Lawfully Intervening
for Their Interests.
Appeal of Charles GARDNER.
Appeal of Ernest E. FUCHS and Sound Steamship Lines, Inc.
 Nos. 12178, 12179.
 United States Court of Appeals Third Circuit.
 Argued Oct. 10, 1957.
Decided March 7, 1958, Writ of Certiorari Denied May 19,
1958, See 78 S.Ct. 997.
 
 Sidney M. Wittner, New York City (Lasser & Lasser, Newark, N.J., on the brief), for Gardner.
 Corydon B. Dunham, New York City (Marcel Wagner, Jersey City, N.J., Curley C. Hoffpauir, New York City, on the brief), for Fuchs.
 Curley C. Hoffpauir, New York City (Marcel Wagner, Jersey City, N.J., Corydon B. Dunham, New York City, on the brief), for Sound S.S. Lines.
 Before BIGGS, Chief Judge, and MARIS and McLAUGHLIN, Circuit Judges.
 MARIS, Circuit Judge.
 
 
 1
 These cross-appeals arise out of an admiralty suit brought by the libelant, Charles Gardner, in the District Court for the District of New Jersey against the Motor Vessel Calvert and her alleged owners, the respondents, Ernest E. Fuchs and the Sound Steamship Lines, Inc., following the alleged breach of an oral agreement to charter the Calvert. The libel asserted two causes of action. In the first, the libelant claimed the sum of $7900 for expenses incurred in hiring a crew and for the value of equipment furnished the Calvert and in the second, he claimed damages in the sum of $100,000 as a result of the respondents' breach of the charter party and withdrawal of the vessel. After a trial, the district court on October 3, 1956 filed findings of fact and conclusions of law as follows:'Findings of Fact
 
 
 2
 '1. In July, 1951, respondent Sound Steamship Lines, Inc. was the owner of the Motor Vessel 'Calvert', and respondent Ernest E. Fuchs was president of said corporation.
 
 
 3
 '2. Beginning on July 2, 1951, libellant negotiated with respondent Fuchs with a view toward chartering the 'Calvert'. A parol charter resulted. Charter was for the purpose of transporting passengers from New York City to Atlantic Highlands en route to the Monmouth Park Race Track at Oceanport, New Jersey, for Sunday trips to Atlantic Highlands, and for other stated purposes at the end of the racing season.
 
 
 4
 '3. Libellant also delivered equipment to complete the outfitting of the 'Calvert' to that ship on July 8, 1951, which respondent Fuchs took on board without protest, the evidence indicating to the court that the value of said equipment was $1,500.00.
 
 
 5
 '4. On July 8, 1951, libellant put a crew aboard the 'Calvert' without protest from respondent Fuchs.
 
 
 6
 '5. On July 10, 1951, libellant appeared with $5,000.00 as an advance ready to proceed, but respondent Fuchs failed, neglected and refused to go through with the charter agreement.
 
 
 7
 '6. Respondent Fuchs removed the vessel from its berth in New York to another in Perth Amboy, refusing to carry out the charter agreement.
 
 
 8
 '7. The equipment delivered by libellant has remained aboard the 'Calvert' and due demand for payment has been made.
 
 
 9
 '8. No attempt to pay for the equipment or to go through with the parol charter agreement has been made by respondent Fuchs, though duly demanded by libellant.
 
 
 10
 'Conclusions of Law
 
 
 11
 '1. This court has jurisdiction of the subject matter and the parties involved.
 
 
 12
 2. A parol charter existed by virtue of the arrangement agreed upon by the parties.
 
 
 13
 '3. Respondent Fuchs accepted and agreed to pay for equipment furnished by libellant.
 
 
 14
 '4. Libellant is entitled to a decree against respondents for loss of profits from breach of charter, in the sum of $49,385.00, and for the equipment delivered by libellant aboard the 'Calvert', in the sum of $1,500.00, with interest from July 12, 1951[1] and costs of court.
 
 
 15
 'The damages have been determined in accordance with the principles set down in Interchemical Corp. v. Uncas Printing and Finishing Co., 1956, 39 N.J.Super. 318, 120 A.2d 880, which adopts the rule set forth in Rynveld v. Depuis, 1930, 5 Cir., 39 F.2d 399, which latter case cites with approval a similar rule set forth in Eastman Kodak Co. v. Southern Photo Material Co., 1923, 5 Cir., 295 F. 98, where the court said at p. 102:
 
 
 16
 "Damages are not rendered uncertain because they cannot be calculated with absolute exactness. It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate. The defendant, whose wrongful act creates the difficulty, is not entitled to complain that the amount of the damages cannot be accurately fixed.'
 
 
 17
 Motions were filed by the respondents for reconsideration, or for dismissal of the libel as to both respondents, or for dismissal of the libel as to the respondent Fuchs individually. These motions were denied by the district court which on December 6, 1956 entered a final judgment in favor of the libelant and against the respondents Fuchs and Sound Steamship Lines in the sum of $50,885 with interest at 4% per annum from October 3, 1956, the date on which the district court had filed its findings of fact and conclusions of law. These appeals by both parties followed.
 
 
 18
 On the respondents' appeal, Fuchs contends that the district court erred in refusing to dismiss the libel as to him individually and Sound Steamship Lines contends that the award of damages to the libelant is unsupported in the evidence. The libelant in his cross-appeal contends that the district court erred in awarding him interest at the reduced rate of 4% from October 3, 1956 only instead of at the rate of 6% from July 12, 1951, as directed in the court's amended conclusion of law No. 4. We will consider these issues seriatim viewing, as we must, the evidence as to each issue in the light most favorable to the appellee involved.
 
 
 19
 The respondent Fuchs argues that in the light of the district court's finding of fact No. 1 that 'In July, 1951, respondent Sound Steamship Lines, Inc. was the owner of the Motor Vessel 'Calvert', and respondent Ernest E. Fuchs was president of said corporation', the district court erred in refusing to dismiss the libel as to him. We think that he is right in this contention and that his motion to dismiss should have been granted. The libelant, however, argues that the respondent Fuchs should be held personally liable because he owned 100% of the stock. This, even if the premise were true, would not follow. It is a well settled rule that a corporation is for most purposes an entity distinct from its individual shareholders, Klein v. Board of Tax Supervisors, 1930, 282 U.S. 19, 24, 51 S.Ct. 15, 75 L.Ed. 140; New Colonial Co. v. Helvering, 1934, 292 U.S. 435, 442, 54 S.Ct. 788, 78 L.Ed. 1348, and only in exceptional instances may the separate corporate identity be disregarded. Furthermore it is normal for the president of a corporation to act as its chief executive officer and agent, and contracts made by a corporation's authorized agent within the scope of its legitimate purposes are binding on it. Bank of Columbia v. Patterson, 1813, 7 Cranch. 299, 11 U.S. 299, 3 L.Ed. 351; Chesapeake & Ohio Canal Co. v. Knapp, 1835, 9 Pet. 541, 34 U.S. 541, 9 L.Ed. 222; Restatement, Agency, 4, 320, 328. In the present case there was no evidence that the respondent Fuchs intended to be bound personally, or that he acted beyond the scope of his authority as president. Accordingly he may not be held personally liable and the judgment must be reversed insofar as it holds him individually liable for the value of the equipment furnished the Calvert and for the damages flowing from the breach of contract.
 
 
 20
 The respondent Sound Steamship Lines' attack on the decree is three-fold: Its first contention is that the district court erred in holding it liable in the sum of $1500 for equipment delivered to the Calvert. Little need be said in respect to this contention. Fuchs admitted in his testimony that equipment had been delivered aboard the Calvert and that it remained unpaid for. There is ample support in the record for the district court's conclusion that the respondent Sound Steamship Lines is liable for this equipment. The conclusion, accordingly, will not be disturbed.
 
 
 21
 The respondent Sound Steamship Lines' second contention is that the district court erred in finding that the parties had entered into an oral charter party. It argues that the negotiations between the parties were merely preliminary and tentative, that there was no meeting of the minds as to the terms of the contract and that they intended that the terms would finally be reduced to writing before becoming binding. The evidence discloses that on July 8, 1951, the day on which the libelant delivered equipment to the Calvert and put a crew aboard, Fuchs prepared and submitted to the libelant a form of charter party upon stationery of the respondent Sound Steamship Lines which the libelant rejected. This draft mentioned a performance bond, referred to a corporation instead of the libelant as charterer, and contained blank and unfilled spaces. Fuchs said he would redraw it to conform to their agreement. This he did not do. But the fact that the parties intended to put their agreement in writing is not necessarily inconsistent with the fact that they may have orally reached an agreement upon the terms of a contract. That parties may make a binding oral agreement is a well-settled principle in the law of admiralty. Union Fish Co. v. Erickson, 1919, 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261; American Hawaiian S.S. Co. v. Willifuehr, D.C.Md.1921, 274 F. 214, affirmed United States Fidelity & Guaranty Co. v. American Hawaiian S.S. Co., 4 Cir., 280 F. 1023; Tomkins Cove Stone Co. v. Bleakley Transp. Co., 3 Cir., 1930, 40 F.2d 249; Salmons Dredging Corporation v. Herma, 4 Cir., 1950, 180 F.2d 233. The essential prerequisite to the formation of such a contract is the intention to do so, which the district court must determine from the actions of the parties and the surrounding circumstances. See the discussion by Judge Leahy in Canister Co. v. National Can Corp., D.C.Del.1945, 63 F.Supp. 361, 365-366, and Restatement, Contracts, 71.
 
 
 22
 As Judge Goodrich said, in speaking for this court in Smith v. Onyx Oil & Chemical Co., 1955, 218 F.2d 104, 108, 50 A.L.R.2d 216:
 
 
 23
 'Was there a contract? On this subject there are two rules which can be stated without the slightest disagreement by anyone. If the parties intend not to be bound until a written memorial is executed by each, then they are not bound until that event takes place. On the other hand, although parties may intend to put their agreement in writing, it does not follow that they have not made a contract until the writing is completed and signed. These two rules are set out in Williston on Contracts, 28 (Rev. ed., 1936), and in Corbin on Contracts, 30 (1950). The emphasis of these two eminent writers is, it seems to us, inclined toward finding the formation of a contract prior to the signing of the document unless the parties pretty clearly show that such signing is a condition precedent to legal obligation. And since contract law has passed the formalism of elaborate doctrines pertaining to sealed instruments, it seems to us such emphasis is quite natural and quite correct. * * *
 
 
 24
 'As the text writers point out, the question here is one of intention of the contracting parties. Corbin is especially clear on this. He says:
 
 
 25
 "The courts are quite agreed upon general principles. The parties have power to contract as they please. They can bind themselves orally or by informal letters or telegrams if they like. On the other hand, they can maintain complete immunity from all obligation, even though they have expressed agreement orally or informally upon every detail of a complex transaction. The matter is merely one of expressed intention. If their expressions convince the court that they intended to be bound without a formal document, their contract is consummated, and the expected formal document will be nothing more than a memorial of that contract.' Corbin on Contracts, 30 (1950).'
 
 
 26
 In the present case the testimony was sharply conflicting. It is quite evident that the district court credited the libelant's witnesses and not those for the respondents. Since there is support in the evidence for the finding of the district court that an oral contract of charter was made, that finding may not be stamped as clearly erroneous and it must be affirmed. McAllister v. United States, 1954, 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20.
 
 
 27
 This brings us to the respondent Sound Steamship Lines' third and final contention, namely, that the award of $49,385 for loss of profits is so conjectural and speculative as to be erroneous. It is settled that in establishing loss of future profits it is only the fact that some loss has resulted from the defendant's breach of contract which must be proved with certainty. Once that fact has been established the actual amount of the lost profits need not be proved with certainty but may be estimated from the facts in evidence, including the inferences to be drawn from them and the probabilities which they suggest. Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 562-563, 51 S.Ct. 248, 75 L.Ed. 544; Palmer v. Connecticut Ry. & Lighting Co., 1941, 311 U.S. 544, 561, 61 S.Ct. 379, 85 L.Ed. 336; Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 263-266, 66 S.Ct. 574, 90 L.Ed. 652; Wakeman v. Wheeler & Wilson Mfg. Co., 1886, 101 N.Y. 205, 209, 4 N.E. 264, 266; Agitair Products Corp. v. F. C. Castelli Co., 3 Cir., 1952, 195 F.2d 798. With these principles in mind we first consider whether the evidence which the libelant produced proved with reasonable certainty that he did actually suffer some loss of future profits as the result of the breach.
 
 
 28
 The libelant testified that prior to the time he negotiated for the charter of the Calvert he had been engaged in the maritime business for approximately 17 years, and that he had been connected with the Central Railroad Company of New Jersey for whom he had operated the S.S. Sandy Hook, which vessel he and others had acquired in 1947 and then had conveyed to the corporation, S.S. Sandy Hook, Inc., of which the libelant was president. Since the fall of 1949 the libelant operated the Sandy Hook as general manager for the debtor in possession under a court order issued pursuant to Chapter XI of the Bankruptcy Act, 11 U.S.C.A. 701 et seq. For several years prior to November 1950, when the Sandy Hook was seriously damaged, the vessel had been used from the middle of June until the end of the first week in August to transport passengers from New York City to Atlantic Highlands, New Jersey, en route to the race track operated by the Monmouth Park Jockey Club. In addition to this use, the vessel was operated to transport commuters from New York City to Atlantic Highlands during the racing season, for moonlight cruises, and for private charter parties, which libelant testified was the use he intended for the Calvert. It was certain in the middle of June, 1951, that the Sandy Hook would not be operable that season. On July 31, 1951 the corporation S.S. Sandy Hook, Inc., was adjudicated a bankrupt and a trustee was appointed. And it was between the middle of June and early in July, 1951, that the libelant negotiated for the charter of the Calvert.
 
 
 29
 The Calvert had not been in commercial use for several years, and was, at that particular time, in drydock where a new diesel engine was being installed in her. For the uses for which the libelant intended the vessel the Calvert needed more life preservers, chairs, fire extinguishers and other equipment. Fuchs knew of its intended use for transporting the passengers bound for the race track. It appears that he himself offered to convey these passengers in the Calvert for the Monmouth Park Jockey Club at about the time of the breach. A representative of the Monmouth Park Jockey Club testified that during prior years the Sandy Hook had given the Club this service and that it intended the Calvert to be used for this purpose during the remainder of the 1951 racing season. In addition to this prospective use of the Calvert the libelant testified that there were charter parties originally arranged for the Sandy Hook for the 1951 season which had been designated for the Calvert.
 
 
 30
 The respondent Sound Steamship Lines urges that since the libelant was undertaking a new venture the possibility of profit from it was unascertainable. But we do not think that it can be said that the libelant was venturing on a new and untried business. While he was seeking to obtain another vessel it was to carry on the same business in which he had long been engaged. It was not a new venture in the sense used in the cases which the respondent cites. We conclude that there was ample evidence to support the conclusion that the libelant had suffered damage from the respondent's breach of the charter party.
 
 
 31
 We turn then to the contention that there was no basis in the evidence for determining the loss of profits upon which the district court could compute the libelant's actual damages. It has long been recognized that a party may recover damages for the loss of anticipated profits when they result from a breach of contract. All damages resulting necessarily and directly from the breach are recoverable. United States Trust Co. of New York v. O'Brien, 1894, 143 N.Y. 284, 287-289, 38 N.E. 266, 2679 As we have seen, the rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. The trier of the facts may make a just and reasonable estimate of such damages based on relevant data and render its verdict accordingly. In such circumstances juries are allowed to act upon probable and inferential, as well as direct and positive proof. Eastman Kodak Co. v. Southern Photo Material Co., 1927, 273 U.S. 359, 376-379, 47 S.Ct. 400, 71 L.Ed. 684; Story Parchment Co. v. Paterson Parchment Paper Co., 1931, 282 U.S. 555, 561-564, 51 S.Ct. 248; Bigelow v. RKO Radio Pictures, 1946, 327 U.S. 251, 264, 66 S.Ct. 574. In this regard it was said in Palmer v. Connecticut Ry. & Lighting Co., 1941, 311 U.S. 544, 560, 61 S.Ct. 379, 385: 'The ways compensatory damages may be proven are many. The injured party is not to be barred from a fair recovery by impossible requirements. The wrongdoer should not be mulcted, neither should he be permitted to escape under cover of a demand for nonexistent certainty.' It is true, of course, that remote and speculative anticipated profits are not recoverable since there is no reasonable basis for their computation, and that an award of anticipated net profits may not rest solely upon a rough estimate.
 
 
 32
 To prove the amount of anticipated damages the libelant testified that the Sandy Hook made two round trips a day from New York to Atlantic Highlands, one trip for race track passengers and an intermediate trip for commuters, which trips he had proposed to continue with the Calvert; that the passenger capacity of the Sandy Hook was 1800, whereas the Calvert would have accommodated 1300 passengers; that a dining room and bar had been operated by a concessionaire on the Sandy Hook from whom the corporation received a designated share of the gross receipts; that he was to pay $400 a day for the charter of the Calvert and to provide $75,000 hull and machinery insurance, $250,000 protection and indemnity insurance, pay the crew and all the operating expenses, Fuchs to select an engineer whose wages were to be paid by the libelant. The charter was to begin as soon as Fuchs obtained the necessary Coast Guard certificate. There were charter parties which had originally been arranged for the Sandy Hook and which had been designated for the Calvert. There was some evidence to indicate that the income of the Sandy Hook for ticket sales for July and August, 1950, was $125,511.60; that about $16,000 was received from the dining room and bar concessionaire as 20% of the dining room receipts and 25% of the bar receipts; and that other amounts were received from charter parties. The libelant also testified as to the estimated daily cost of operating the Calvert. There was evidence that in past years an average of 800 passengers a day had been carried on the Sandy Hook during the racing season to Atlantic Highlands and that the vessel had been used for private charter parties during the summer season until Labor Day.
 
 
 33
 Martin J. Gross of the Meseck Steamboat Co., Inc., testified that Meseck operated from New York City to Atlantic Highlands for the Monmouth Park Jockey Club at a guaranteed sum of $1300 per day from Monday, July 16th to and including August 8th, 1951, using a larger vessel than the Calvert. The number of passengers transported during that period by Meseck is in the record. Gross also testified that one charter had been turned over to Meseck by the libelant for which it received $1500 and carried 969 passengers. Meseck was unable to take any other charters, however, because it had a full schedule for the season. There was evidence that the respondent Sound Steamship Lines had been paid at the rate of $2 per passenger for the round trip from New York City to Atlantic Highlands by the Monmouth Park Jockey Club, which issued a combination ticket including entrance to the race track, and that in 1951 the rate would have been $2.50.
 
 
 34
 Upon the basis of this evidence the trial judge found the libelant's loss of profits to be $49,385. We cannot say that this finding is unreasonable or that it lacks sufficient basis in the evidence. True, it cannot be defended as mathematically demonstrable. But, as we have seen, mathematical certainty is not required in a case such as this. It is sufficient where, as here, the evidence discloses the elements of damage with indications of probable amount sufficient to provide the court or jury with the basis for a reasonable estimate of the whole loss. We accordingly conclude that the award of damages for loss of profits in the sum of $49,385 must be sustained.
 
 
 35
 One matter remains to be considered, the issue raised by the libelant on his appeal that he is entitled as a matter of right to the allowance of interest from July 12, 1951, as directed in conclusion of law No. 4 of the district court. He asserts that the court in allowing interest in its judgment only from October 3, 1956 violated the law of restitution in admiralty. For this proposition the libelant relies on The President Madison, 9 Cir., 1937,91 F.2d 835. However, that case does not support his position but is authority for the general rule, which has long been recognized, that interest may be allowed to make just compensation for losses in admiralty cases but that the award of interest depends upon the circumstances of each case and rests in the discretion of the court. The Scotland, 1886, 118 U.S. 507, 518-519, 6 S.Ct. 1174, 30 L.Ed. 153; The Albert Dumois, 1900, 177 U.S. 240, 255, 20 S.Ct. 595, 44 L.Ed. 751; The Manhattan, 3 Cir., 1936, 85 F.2d 427, certiorari denied United States v. Bessemer, 300 U.S. 654, 57 S.Ct. 432, 81 L.Ed. 864; The Stjerneborg, 9 Cir., 1939, 106 F.2d 896, 898-899; The Wright, 2 Cir., 1940, 109 F.2d 699, 702; Carl Sawyer, Inc., v. Poor, 5 Cir., 1950,180 F.2d 962, 963. See 3 Benedict on Admiralty, 6th ed., 419; and Annotations, 96 A.L.R. 20; 111 A.L.R. 1300; 36 A.L.R.2d 354, 359.
 
 
 36
 The libelant urges, however, that the principle above referred to applies only to collision cases and not to cases in which damages are awarded for breach of contract. We do not agree. Where damages are unliquidated and can only be established by litigation the application of the rule is a matter of discretion for the court dependent upon the circumstances of the case. W. R. Grace & Co. v. Luckenback S.S. Co., D.C.E.D.Va., 1919, 258 F. 49, affirmed 4 Cir., 1920, 267 F. 676, certiorari denied 254 U.S. 644, 41 S.Ct. 14, 65 L.Ed. 454. Although the district court originally indicated in its conclusions of law that it would allow interest from July 12, 1951, it had the power in the exercise of its discretion to recede from that allowance, reconsider the matter, and redetermine what was a just and equitable allowance under the circumstances. O'Donnell Transp. Co. v. City of New York, 2 Cir., 1954, 215 F.2d 92, 94.
 
 
 37
 The libelant also contends that he is entitled as a matter of right to interest at the rate of 6% per annum, which is the legal rate of interest allowed in New Jersey, N.J.S.A. 31:1-1, and relies for this proposition upon admiralty cases in which the courts have found the application of the interest rate fixed by the state to be proper. While it may well be that 6% interest would have been a proper allowance, we cannot say that the district court erred in allowing interest at the lower rate of 4%. Section 1961, Title 28 U.S.C., provides that in a civil case interest shall be allowed on a judgment at the rate allowed by state law. However, Congress has not made the same provision in the admiralty, in which the interest rate to be allowed on a judgment is a matter within the sound discretion of the district court. We do not find that there has been an abuse of discretion in this regard in the present case.
 
 
 38
 Accordingly, the judgment of the district court will be reversed as against the respondent Ernest E. Fuchs. As against the respondent Sound Steamship Lines, Inc., the judgment will be affirmed.
 
 
 
 [1]
 The date 'July 12, 1951' was inserted by amendment of October 5, 1956 in place of 'July 12, 1956'