**ORIENT MID-EAST GREAT LAKES SERVICE, Libelant,**

v.

**INTERNATIONAL EXPORT LINES, LTD., Respondent.**

No. 4291.

United States District Court
D. Maryland.

Aug. 2, 1962.

William A. Grimes and Ober, Williams, Grimes & Stinson, Baltimore, Md., Haight, Gardner, Poor & Havens, New York City, proctors for libelant.

John H. Skeen, Jr., Baltimore, Md., Platow & Lyon, New York City, proctors for respondent.

NORTHROP, District Judge.

Funch, Edye & Co., Inc., steamship agents and ship brokers of New York, New York, were engaged by respondent, International Export Lines, Ltd., through its authorized agent to procure a charter for its vessel known as the HONGKONG EXPORTER. Shortly before May 18, 1961, the ship broker determined that one of its customers, Orient Mid-East Great Lakes Service, the libelant, was interested in chartering such a vessel on a time charter basis for a period of twelve to fifteen months. The ship broker was told to proceed to negotiate with libelant and to drop other tentative negotiations. This Funch, Edye & Co., Inc., did, using as a fundamental basis the

per long ton. Jefferson Lake was, therefore, fully reimbursed for all costs. (See Stipulation, paragraph VII.)

Time Charter Government Form approved by the New York Produce Exchange October 3, 1946.

Out of this general background the issues of this case come before the court.

The question arising here is: Was there a valid oral charter of the SS HONGKONG EXPORTER?

The ship broker's function is to bring together owners and prospective charterers of vessels. Both parties had dealt with Funch, Edye & Co., Inc. (Funch-Edye) prior to this transaction. According to custom, James J. McNelis of Funch-Edye dealt with the respondent International Export Lines, Ltd. (International) through its Morley L. Cho, whereas Funch-Edye's Gerald Harris negotiated with Orient Mid-East Great Lakes Service's (Orient Mid-East's) Orestes Pendias.

No one disagrees that negotiations proceeded rapidly, so that all aspects of the charter were terminated save (1) the amount of stores and water to be allowed the owner, (2) the exclusion of the United Kingdom and Bahama ports as trading areas, and finally (3) the exclusion of the communist satellite ports from the trading areas.

What are the contentions of the parties and the evidence each urges as substantiating them?

First, Orient Mid-East contends that all matters relative to a binding fixture were present late in the evening of May 18, 1961, save an agreement on the "minor matter" of stores and water. With the concurrence of International's Cho, a cablegram was sent from Funch-Edye's home office to Tokyo (Libelant's Exhibit No. 8):

"HONGKONG EXPORTER FIXED 12/15 MONTHS 29000 ALL DETAILS AGREED EXCEPT 250 TONS STORES WATER WHICH SUBJECT YOUR CONCURRENCE STOP MORLEY REQUEST WE CABLE YOU DIRECT FOR REPLY US 10AM NYTIME MAY 19 STOP VESSEL RETAINS BRITISH FLAG AND TO BE EQUIPPED GREAT LAKES FITTINGS JAPAN STOP DETAILS WILL TELEX REGARDS JIM"

The next morning, May 19, the answer was received (Libelant's Exhibit No. 11):

"JIM HKEXPORTER YOURS THANKS NOW ASCERTAINING FROM MASTER QUANTITY STORES WATER REVERTING SOONEST MEANTIME AWAITING YOUR TELEX REGARDS"

Upon receipt of this reply, further conversations were held between McNelis directly with Cho for International, and between McNelis and Harris, who dealt with Orient Mid-East. All testimony and joint notes kept by McNelis and Harris indicate that the ultimate figure of 350 tons for stores and water was agreed upon on that date. It is at this juncture that International's Cho interjected the exclusion of "the U. K. ports and the Bahamas." He also contends the 350 tons stores and water were tied in with this exclusion as a "package deal."

But is would certainly appear, as subsequent testimony of all concerned substantiated, that no such intention was present because ultimately, although other matters were then in dispute, the brokerage percentages were changed to compensate for this reduction of the vessel's trading area.

The testimony and exhibits compel the court to find as a fact that there was a valid oral "time charter" of the vessel HONGKONG EXPORTER on May 19, 1961.

The Time Charter is the confirming document forwarded to International on May 26, 1961, and rejected on that date (Libelant's Exhibit No. 3):

"The Charter Party proposed and submitted with your advices of May 26, 1961 is not in accord with our understanding.

"Line 32 excludes only Red China, Russia and Israel. The terms proposed by us included excepting United Kingdom, Bahamas ports and

Russian satellites. Our Principals insist upon these exclusions.

"Further, line 172 to 175 is incorrect. The commissions were to be 1% and the address commission 2% as proposed by Mr. Pinto and accepted.

"If, therefore, you will make the necessary corrections and resubmit the charter, the owners are prepared to authorize execution."

International asks these questions: First, did the parties intend to be bound prior to the execution of a formal document of charter?

■ The course of negotiations carried on herein indicates that the parties were proceeding in the ordinary manner under maritime law and contemplated the usual charter or oral contract.

"For it is an established rule of ancient respectability that oral contracts are generally regarded as valid by maritime law. * * *" Kossick v. United Fruit Co., 365 U.S. 731, 734, 81 S.Ct. 886, 889, 6 L.Ed.2d 56 (1961). See Note 4 thereunder. A rehearing was denied. 366 U.S. 941, 81 S.Ct. 1657, 6 L.Ed.2d 852.

See also American Hawaiian S. S. Co. v. Willfuehr, 4 Cir., 274 F. 214 (1921); Putnam Lumber Co. v. Ashcraft-Wilkinson Co., 5 Cir., 96 F.2d 233 (1938).

The cablegrams, the testimony of Orient Mid-East's Pendias, Funch-Edye's McNelis and Harris, as well as International's Cho support the finding that, in maritime parlance, there was a fixture on 19 May 1961. Orient Mid-East meets its burden of proof of the oral charter when it shows through the testimony of all concerned, with the exception of Morley L. Cho of International, that the 350 tons stores and water were agreed upon. Even International did not mention the stores and water as a reason for refusing to sign the charter, as set out in its letter of May 26, Libelant's Exhibit No. 3 supra, and again on May 31, 1961 (Libelant's Exhibit No. 5):

"We acknowledge receipt of a copy of Eagel Ocean Transport's letter of May 31, 1961 to you and want to state at the very inception that you have known us long enough to know that Owners will fulfill any obligation they undertake, providing a clear acceptance is made.

"The reference to the commissions was neither oversight nor inadvertence. The total 3% commission was proposed by Mr. Pinto in connection with the negotiations of the exclusion of the United Kindom-Bahamas ports which you informed us was agreed by charterers, after which we accepted it.

"Owners want a definite decision from charterers by close of business tomorrow, June 1, 1961, as the ship is unfixed at the moment and unless fixture is confirmed on the terms stated by us, in our letter of May 26, Owners will consider themselves free to charter the vessel otherwise.

"Your early advices are requested."

The answer, then, to the first question is *yes*. There are no "novel" facts here to negate the conclusion that the usual procedure in chartering was employed in this instance and resulted in a binding contract. The terms were quickly agreed to, and negotiations were handled by the broker in the usual manner, all by telephone and cablegram with an ultimate confirming document.

Second, International asks if, there was an oral charter, was there any really complete meeting of the minds on all essential details?

International first takes the position that there was never any resolution as to the tonnage allowable to the owners for stores and water. The testimony and exhibits, as stated supra, refute this contention, as it was everyone's understanding that this item was fixed at 350 tons on May 19.

But International further urges that "the exclusion of the United Kingdom Ports and the Bahamas" was a package deal for its concession to agree to the lesser tonnage than its vessels ordinarily

stow. International's Cho seems to be the only one who had the package-deal notion. The most convincing evidence that this was not the case is the corroboration of Funch-Edye's Anthony Pinto, vice president and a superior of McNelis and Harris. Pinton testified by deposition that he procured the agreement on May 23 of International's Tung and Cho that, in order to get Orient Mid-East to agree to limit the trading area further by excluding the United Kingdom ports and the Bahamas, he would give Orient Mid-East one-fourth from Funch-Edye's commission and International was to increase its commission by one-fourth, making 2% to the charterer Orient Mid-East and a total commission of 3% accepted by International (Libelant's Exhibit No. 5, supra). After Harris indicated Orient Mid-East's agreement on 350 tons, while McNelis was talking with Cho on May 19, the matter of the tonnage was not raised again. International, in refusing to sign the charter in Libelant's Exhibit No. 3, supra, made no reference to stores and water, all of which leads to the conclusion that the matter of tonnage for water and stores was resolved on May 19, 1961, as Orient Mid-East contends.

In view of this finding we need not consider Orient Mid-East's argument that the tonnage was a detail of slight importance, a minor matter left for further agreement. Williston, Contracts, § 48, at pp. 156, 157 (3rd Ed.1957); Restatement, Contracts § 32, comment c, illustration No. 11, p. 43 (1932). This point need not be belabored, and the quick resolution of tonnage difference merely goes to buttress Orient Mid-East's position that it was a detail of no consequence in the formation of the contract.

It is our finding that the exclusion of the United Kingdom ports and the vessel's home port, the Bahama Islands, was a late starter and subsequent to the fixture of May 19. Even so, these further restrictions on the trading area for the charter, which originally said and continued to say "world-wide trade excluding Red China, Russia and Israel", were capable of becoming an addendum to the charter.

The exclusion of the United Kingdom ports and the Bahamas first was mentioned by Cho to McNelis, to Harris, to Orient Mid-East's Pendias on May 19. As we have observed, McNelis and Harris kept joint notes from which each talked with his respective client. The United Kingdom and Bahamas were added by McNelis to the *exclusion*, "Red China, Russia and Israel."

These became the principal point of Pinto's discussion with Tung and Cho on May 22 and 23.

In these subsequent discussions appeared the crucial addition. For on May 23 there was interjected, according to Orient Mid-East and Funch-Edye, for the first time, the exclusion of "communist satellite ports." Pinto, realizing this was a new thought, remonstrated with Tung. In turn, Tung, according to Pinto, called upon the broker's ingenuity to accomplish this exclusion for International. Tung was never produced by respondent International, although his participation in these negotiations was equal if not paramount to that of Cho.

The joint notes, and all of the testimony, save that of Cho, indicate that the exclusion of communist or Russian satellites was a tardy character on the stage of this transaction. There was already a fixture, and the curtain had been rung down on the negotiations.

Let it be noted in passing that, at the trial, Cho's notes were introduced (Respondent's Exhibit No. C) and substantiate the joint notes of McNelis and Harris save for the notation of "communist ports."

In the numerous telephone conferences settling all of the details, both Harris and McNelis say that *all* of their joint notes were repeatedly read to Cho of International and Pendias of Orient Mid-East, including the trading area exclusion, namely "Red China, Russia and Israel", which became of importance, ac-

cording to Cho, on May 19. From the weight of the testimony and exhibits, the scale must tip in favor of the finding of fact that, until Tung and Cho started their conference on May 23 with Pinto of Funch-Edye, the communist satellite ports were not mentioned, no matter what the prior intention of Cho might have been. Therefore, they were no rock upon which the negotiations foundered.

But International seeks a passage through this reef by way of contentions that (1) broker Funch-Edye's "knowledge" that the owner required a communist satellite exclusion was imputable to the charterer and/or (2) the negligence of the broker, as double agent, relieves the principal.

As to the first proposition, the factual situation, while somewhat cloudy, cannot shroud the repetition of the terms by McNelis to Cho including the existing exclusions. But no actual knowledge of the communist satellite exclusion can be discerned.

International wishes to show a pattern in a charter for one of its other vessels, the HONGKONG MANUFAC-TURER, in which the communist satellites were part of the trading area exclusion. This charter was successfully negotiated by McNelis, who repeatedly asked Cho to allow the use of this charter as a model for the HONGKONG EX-PORTER, and according to him, Cho just as frequently said that he should forget this detail, and work . out *this* charter with Orient Mid-East. Cho said he did not mean "forget" that portion of the contract in reference to the communist satellites. Thus, International seeks to establish knowledge through prior dealing and defeat the charter.

The ship's broker is peculiar to himself.

"The 'fixture' of a ship—the bringing to successful conclusion of the negotiations precedent to signing the charter—is complicated work, performed by a corps of brokers who maintain an elaborate network of intelligence that enables them to bring together the needed tonnage and the cargo waiting or in process of assembly." Gilmore & Black, The Law of Admiralty, at p. 173 (1957).

The ship broker is more of an intermediary than other types of brokers.

"Therefore, if either party instead of communicating with the other party directly makes use of an intermediary who makes a mistake in the words transmitted, the mistake is binding on the party employing the intermediary." Williston, Contracts § 94, at p. 341 (3rd Ed.1957)

Further, while it is true that Funch-Edye had negotiated the charter for the HONGKONG MANUFACTURER in which communist satellite ports were excluded, one swallow does not make a summer. The joint notes, the testimony, the resolution of the area of dispute, the amount of the charter, cannot but add up to the fact that there was no undisclosed knowledge possessed by McNelis which was imputable to the libelant, Orient Mid-East.

The usual custom of ship broker's trade does not lend itself to the appellation of a double agent in the usual connotation of that term. He is more of an expert medium in a complicated seance. The facts do not warrant an assumption that McNelis had a "background of knowledge" which he carelessly neglected to impart to charterer and owner and thus relieve the responsibilities of the principal.

Therefore, for the above reasons libelant's proctor will prepare the necessary interlocutory decree in favor of the libelant.